140 T.C. No. 17

UNITED STATES TAX COURT

LAWRENCE G. GRAEV AND LORNA GRAEV, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30638-08.　　　　　　　　　　Filed June 24, 2013.

Petitioner husband ("P-H") contributed cash and a conservation easement to N, a charitable organization. Before the contribution, N at P-H's request issued to P-H a side letter which promised that, in the event R disallows Ps' charitable contribution deductions, N "will promptly refund your entire cash endowment contribution and join with you to immediately remove the facade conservation easement from the property's title". Ps claimed charitable contribution deductions for the cash and easement donations. R contends the side letter made those contributions conditional gifts that are not deductible under I.R.C. sec. 170, since the likelihood that N would be divested of the cash and easement was not negligible.

<u>Held</u>: Ps' charitable contribution deductions are not allowed because at the time of P-H's contributions, the possibility that the deductions would be disallowed and, as a result, that N would return the contributions was not "so remote as to be negligible", under 26

C.F.R. secs. 1.170A-1(e), 1.170A-7(a)(3), and 1.170A-14(g)(3),
Income Tax Regs.

Frank Agostino, Eduardo S. Chung, Jeremy M. Klausner, and Reuben G.

Miller, for petitioners.

Shawna A. Early, for respondent.

## CONTENTS

FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    NAT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    The property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Increased IRS scrutiny of easement contributions. . . . . . . . . . . . . . . . . . . . . 6
    NAT's solicitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    The side letter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Appraisal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Noncash contribution to NAT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Cash contribution to NAT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Subsequent communications from NAT. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    2004 and 2005 Federal income tax returns. . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Notice of deficiency. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

OPINION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    I.     Charitable contributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         A.     Generally.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
         B.     Conditional gifts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
         C.     Partial interests in general. . . . . . . . . . . . . . . . . . . . . . . . . . . 22
         D.     Conservation easements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      E.      Construing "so remote as to be negligible". . . . . . . . . . . . . . 27

II.      Analysis.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      A.      The possibility of disallowance by the IRS. . . . . . . . . . . . . . 28

            1.      The possibility of disallowance as a matter of fact. . . . 28

                    a.      Increased IRS scrutiny.. . . . . . . . . . . . . . . . . . . 29
                    b.      The side letter.. . . . . . . . . . . . . . . . . . . . . . . . . 33

            2.      Disallowance as a subsequent event. . . . . . . . . . . . . . 35

      B.      The possibility of return of the contributions. . . . . . . . . . . . 39

            1.      Conservation easements under New York law. . . . . . . 40
            2.      Merger doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
            3.      Nullity.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
            4.      Voluntary removal of the easement. . . . . . . . . . . . . . . 51

III.      Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

GUSTAFSON, <u>Judge</u>:  Pursuant to section 6212(a),[1] the Internal Revenue Service ("IRS") determined deficiencies in tax for petitioners, Lawrence and Lorna Graev, in the amounts of $237,481 for 2004 and $412,620 for 2005, resulting from the disallowance of charitable contribution deductions the Graevs claimed for those years.  The IRS also determined that Mr. and Mrs. Graev are

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.; "the Code"), as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

liable for accuracy-related penalties under section 6662(h) and alternatively under section 6662(a) for 2004 and 2005. Mr. and Mrs. Graev petitioned this Court, pursuant to section 6213(a), for redetermination of these deficiencies and penalties. The issue for decision at present is whether the deductions that the Graevs claimed for charitable contributions of cash and a conservation easement they donated to the National Architectural Trust ("NAT") should be disallowed because they were conditional gifts.[2] We hold that the Graevs' contributions were conditional, non-deductible gifts.

## FINDINGS OF FACT

The parties submitted this issue fully stipulated pursuant to Rule 122, reflecting their agreement that the relevant facts could be presented without a

---

[2]In January 2010 the parties entered into a stipulation to be bound, by which they agreed that if in this case the Court decides the conditional gift issue in the Graevs' favor, the outcome of some the other issues in this case (chiefly, the valuation of the contributed easement) will follow the outcome of a then-pending case. That case was decided in favor of respondent in July 2010, appealed to the U.S. Court of Appeals for the Second Circuit, vacated and remanded, and decided again in favor of respondent in January 2013. See Scheidelman v. Commissioner, T.C. Memo. 2010-151, vacated and remanded, 682 F.3d 189 (2d Cir. 2012), remanded to T.C. Memo. 2013-18. Decision in that case was entered April 12, 2013, and the time to appeal has not yet expired; but we are able to resolve the issue addressed herein without awaiting the resolution of the Scheidelman issues. We do not resolve here the issue of the Graevs' liability for the penalties, which will be a subject of future proceedings.

trial.[3]  The stipulated facts are incorporated herein by this reference.  Mr. and Mrs. Graev resided in the State of New York when they filed the petition.

NAT

The parties have stipulated that, "[f]or purposes of the Court's decision regarding" the conditional gift issue, NAT is a "qualified organization" under section 170(h)(3), to which a charitable contribution can be made that is deductible for tax purposes.  NAT's stated mission is to preserve historic architecture in metropolitan areas across the United States.  NAT solicits the contribution of facade conservation easements by owners of property with historic significance as determined by the National Park Service.  When NAT solicits potential donors, it features the potential charitable deductions that owners may receive by contributing a facade conservation easement and a corresponding cash endowment to NAT.  In addition, NAT considered it "standard Trust policy", regarding donors of easements and cash, to return a cash contribution to the extent

---

[3]The burden of proof is generally on the taxpayer, see Rule 142(a)(1), and the submission of a case under Rule 122 does not alter that burden, see Borchers v. Commissioner, 95 T.C. 82, 91 (1990), aff'd, 943 F.2d 22 (8th Cir. 1991). However, the burden of proof can be shifted when the Commissioner's position implicates "new matter" not in the notice of deficiency, see note 8 below, addressing the Graevs' contention about supposed "new matter" in this case.

the IRS disallowed a deduction therefor. In numerous instances NAT issued "comfort letters" assuring donors of this policy.

The property

In 1999 Mr. Graev purchased property in a historic preservation district in New York, New York, for $4.3 million. The property is listed on the National Register of Historic Places. During the years at issue Mr. Graev was the sole fee simple owner of the property, and he held the property subject to a mortgage.

Increased IRS scrutiny of easement contributions

On June 30, 2004, the IRS released IRS Notice 2004-41, 2004-2 C.B. 31, which addressed charitable contributions and conservation easements and stated in part:

> The Internal Revenue Service is aware that taxpayers who (1) transfer an easement on real property to a charitable organization, or (2) make payments to a charitable organization in connection with a purchase of real property from the charitable organization, may be improperly claiming charitable contribution deductions under § 170 of the Internal Revenue Code. The purpose of this notice is to advise participants in these transactions that, in appropriate cases, the Service intends to disallow such deductions and may impose penalties and excise taxes. * * *

> \*     \*     \*     \*     \*     \*     \*

> Some taxpayers are claiming inappropriate charitable contribution deductions under § 170 for cash payments or easement

transfers to charitable organizations in connection with the taxpayers' purchases of real property.

In some of these questionable cases, the charitable organization purchases the property and places a conservation easement on the property. Then, the charitable organization sells the property subject to the easement to a buyer for a price that is substantially less than the price paid by the charitable organization for the property. As part of the sale, the buyer makes a second payment, designated as a "charitable contribution," to the charitable organization. The total of the payments from the buyer to the charitable organization fully reimburses the charitable organization for the cost of the property.

In appropriate cases, the Service will treat these transactions in accordance with their substance, rather than their form. Thus, the Service may treat the total of the buyer's payments to the charitable organization as the purchase price paid by the buyer for the property.

Thus, the IRS publicly announced its awareness of abuses related to easement contribution deductions, putting potential donors and donees on notice that easement contribution deductions might be examined and challenged. We find that there was at least a non-negligible possibility that the IRS would challenge an easement contribution deduction thereafter claimed by Mr. Graev.

NAT's solicitation

In the summer of 2004, a representative from NAT contacted Mr. Graev regarding a potential easement donation to NAT. Mr. Graev became aware that he had a "neighbor across the street" who had contributed a facade easement to NAT and who had received from NAT a side letter that promised return of contributions

if deductions were disallowed. Mr. Graev evidently expressed to NAT an interest in making an easement contribution like his neighbor's, but on September 15, 2004, he sent an email to NAT explaining a concern that had arisen:

> My accountants have referred me to Notice 2004-41 * * * issued by the IRS on June 30, 2004, in which the IRS has indicated that it will, in "appropriate cases", disallow charitable deductions to organizations that promote conservation easements and may impose penalties and excise taxes on the taxpayer. They have not advised me to abandon this idea, but they have advised me to be very cautious. What are your thoughts especially as it relates to the side letter, etc.

(The "side letter" to which Mr. Graev referred was NAT's comfort letter assuring that it would refund a contribution in the event that the favorable tax results anticipated from a contribution were not achieved.) Mr. Graev indicated that he had consulted his accountants, and in 2004 those accountants would surely have been aware of published court decisions issued over the past decade that disallowed deductions claimed for the contribution of facade easements.[4] On his

---

[4]For pre-2004 cases involving facade easements, see Richmond v. United States, 699 F. Supp. 578 (E.D. La. 1988) (upholding partial disallowance of contribution deduction where the taxpayer's valuation of facade easement was found excessive); Satullo v. Commissioner, T.C. Memo. 1993-614 (upholding disallowance of contribution deduction where the facade easement was unenforceable in the year at issue because it had not been recorded, and where a mortgage had not been subordinated to the donee's interest), aff'd without published opinion, 67 F.3d 314 (11th Cir. 1995); Dorsey v. Commissioner, T.C. Memo. 1990-242 (upholding partial disallowance of contribution deduction where the taxpayer's valuation of facade easement was found excessive); Griffin v.

(continued...)

tax returns Mr. Graev listed his occupation as "attorney", and we infer that he is an individual of above-average sophistication who, with the help of his accountants, was capable of identifying tax risks. We find that Mr. Graev did in fact identify non-negligible risks regarding the deductibility of facade easements, as evidenced by his September 15 email and subsequent dealings with NAT.

In a response to Mr. Graev's concerns, NAT sent him an email dated September 16, 2004, that stated:

> The IRS notices to which you refer were prompted by recently exposed improprieties at the Nature Conservancy, the nation's largest land conservation easement holding organization. The practice the IRS is concerned with here is when a non-profit acquires property, puts an easement on it and sells it for a reduced price plus a tax-deductible contribution. * * *

---

[4](...continued)
Commissioner, T.C. Memo. 1989-130 (same), aff'd, 911 F.2d 1124 (5th Cir. 1990); Losch v. Commissioner, T.C. Memo. 1988-230 (same); and Hilborn v. Commissioner, 85 T.C. 677 (1985) (same). For pre-2004 cases involving conservation easements generally, see Strasburg v. Commissioner, T.C. Memo. 2000-94 (upholding partial disallowance of contribution deductions where the deductions claimed exceeded the taxpayer's pro rata basis in the property and valuation of the easement was found excessive); Fannon v. Commissioner, T.C. Memo. 1986-572 (upholding partial disallowance of contribution deductions where the taxpayer's valuation of scenic easement was found excessive); Akers v. Commissioner, T.C. Memo. 1984-490, aff'd, 799 F.2d 243 (6th Cir. 1986) (same); and Great N. Nekoosa Corp. v. United States, 38 Fed. Cl. 645, 654 (1997) (holding that conservation easements were not exclusively for conservation purposes when the plaintiffs retained the right to extract sand and gravel).

It is important to distinguish between these activities, which certainly warrant scrutiny, and those engaged in by the National Architectural Trust. * * * We have been in contact with the IRS since the notices were issued and, based upon our discussion with them, have no reasons to expect that we or any of the donations we have received (easement or cash) will be reviewed.

Thus far not a single donation made to the Trust has been disallowed by the IRS (400+ in New York City alone). * * *

With regard to side letters in particular, NAT wrote:

[W]e don't believe they compromise the tax-deductibility of cash donations in the present tax year, as they are simply a confirmation of standard Trust policy.  However, we do not believe this would be the case with a legal agreement that explicitly made the cash donation contingent on the survival of the deduction.  In such a case, we would recommend that the cash donation be treated as tax-deductible once the contingency period has expired. * * *

That is, it was "standard Trust policy" to refund a cash contribution to the extent the IRS disallowed the donor's deduction for the related easement.

Evidently reassured, Mr. Graev executed a facade conservation easement application to NAT on September 20, 2004.  In a cover letter to NAT transmitting the application, Mr. Graev stated:  "I will also be looking for the NAT to issue the 'side' letter we discussed (similar to the one being issued to my neighbor across the street)."

The side letter

On September 24, 2004 NAT sent the side letter to Mr. Graev. The side letter read in pertinent part:

1. In the event the IRS challenges the appraisal of your facade conservation easement and the tax deductions derived therefrom are reduced as a result, we will make a proportionate reduction to your cash endowment contribution and promptly refund the difference to you.

2. In the event the IRS disallows the tax deductions in their entirety, we will promptly refund your entire cash endowment contribution and join with you to immediately remove the facade conservation easement from the property's title.

Neither the side letter nor any other evidence in our record suggests that, in the event the IRS disallowed his contribution, Mr. Graev would have to sue NAT in order to induce it to "remove" the easement. Rather, NAT promised upon disallowance to "join with [him] * * * to immediately remove the facade conservation easement from the property's title". Mr. Graev took NAT at its word, and so do we. That is, we find that there was at least a non-negligible possibility, if the IRS successfully disallowed Mr. Graev's easement contribution deduction, that NAT would do what it said it would do.

Appraisal

Mr. Graev retained the firm of Miller Samuel, Inc. ("MSI"), to prepare an appraisal of the facade easement. In October 2004, MSI issued its appraisal report to Mr. Graev appraising the property at $9 million and concluding that the easement would reduce the value by 11% (or $990,000). Thus, the report appraised the easement at $990,000.

Noncash contribution to NAT

In late 2004[5] Mr. Graev executed a conservation deed granting a facade easement on the property to NAT. The deed in pertinent part provides:

> The Property constitutes an important element in the architectural ensemble of the Treadwell Farms Historic District, and the grant of the Easement as set forth in this instrument will, inter alia, assist in preserving this certified historic structure and in preserving open space for the scenic enjoyment of the general public.
>
> \*       \*       \*       \*       \*       \*       \*
>
> The Grantor does hereby grant and convey to the Grantee, TO HAVE AND TO HOLD, an Easement in gross, in perpetuity, in, on and to the Property, the Building and the Facade, being an Open Space and Architectural Facade Conversation Easement on the Property \* \* \*
>
> \*       \*       \*       \*       \*       \*       \*

[5]The deed recites that it was executed October 11, 2004, but Mr. Graev's signature on the deed was notarized on December 16, 2004, and he delivered it to NAT one day later. NAT's then president, James Kearns, signed the deed on NAT's behalf on December 28, 2004.

A.    * * * This Easement shall survive any termination of Grantor's or the Grantee's existence. The rights of the Grantee under this instrument shall run for the benefit of an may be exercised by its successor and assigns, or by its designees duly authorized in a deed of Easement.

B.    Grantee covenants and agrees that it will not transfer, assign or otherwise convey its rights under this Easement except to another "qualified organization" described in Section 170(h)(3) of the Internal Revenue Code of 1986 and controlling Treasury regulations, and Grantee further agrees that it will not transfer this Easement unless the transferee first agrees to continue to carry out the conservation purposes for which this Easement was created, provided, however, that <u>nothing herein contained shall be constructed to limit the Grantee's right</u> to give its consent (e.g., to changes in a Protected Facade(s)) or <u>to abandon some or all of its rights hereunder</u>. [Emphasis added.]

C.    In the event this Easement is ever extinguished through a judicial decree, Grantor agrees on behalf of itself, its heirs, successors and assigns, that Grantee, or its successors and assigns, will be entitled to receive upon the subsequent sale, exchange or involuntary conversion of the Property, a portion of the proceeds from such sale, exchange or conversion equal to the same proportion that the value of the initial Easement donation bore to the entire value of the property at the time of donation * * *. Grantee agrees to use any proceeds so realized in a manner consistent with the conservation purposes of the original contribution.

        *      *      *      *      *      *      *

<u>Citimortgage Inc.</u> ("Mortgagee/Lender") hereby joins in the execution of this CONSERVATION DEED OF EASEMENT for the sole and

limited purpose of subordinating its rights in the Property to the right of the Grantee, its successors or assigns, to enforce the conservation purposes of this Easement in perpetuity under the following conditions and stipulations:

> (a)    The Mortgagee/Lender and its assignees shall have a prior claim to all insurance proceeds * * * and all proceeds from condemnation, and shall be entitled to same in preference to Grantee until the Mortgage/the Deed of Trust is paid off and discharged, notwithstanding that the Mortgage/the Deed of Trust is subordinate in priority to the Easement.

The deed did not expressly refer to the side letter or incorporate its terms. The City of New York recorded the deed on February 17, 2005.

Cash contribution to NAT

In conjunction with an easement donation, NAT asks a donor to make a cash contribution to NAT equal to 10% of the appraised easement value, in order to pay for NAT's current operating costs and to fund its long-term monitoring and administration needs. In compliance with NAT's request, Mr. Graev made an initial deposit of $1,000 to NAT on September 15, 2004. On December 17, 2004, the same day he delivered the signed deed to NAT, Mr. Graev made a $98,000 cash contribution to NAT, bringing his cash contributions to NAT to a total of $99,000. On January 25, 2005, NAT gave Mr. Graev written acknowledgment of

his 2004 cash and non-cash contributions. That correspondence also included a copy of Form 8283, executed by the appraiser, MSI, and NAT.

Subsequent communications from NAT

Also on January 25, 2005, NAT sent a letter to Mr. Graev informing him that the U.S. Senate Committee on Finance had announced in a press release their "intent to implement reforms to the tax laws governing facade easements that will increase and create additional fines and penalties on promoters, taxpayers and appraisers who participate, aid or assist in the donation of facade easements that are found to be significantly overvalued." Several months later, in August 2005, NAT sent Mr. Graev another letter which read:

> The purpose of this letter is to bring to your attention a development that may be relevant to the tax deductibility of the cash contributions that you made to the National Architectural Trust * * *
>
> In connection with your donation of a facade conservation easement and cash contribution and per your request, we sent you a letter dated September 24, 2004, stating, among other things, that the cash contribution would be refunded in whole or in part if your tax deduction for the easement were reduced or disallowed by the Internal Revenue Service. It has recently been brought to our attention by our attorney that this offer of a refund may adversely affect the deductibility of the cash contribution as a charitable gift. * * *
>
> We urge you to contact your professional tax advisor to determine the actual impact of the refund offer. Of course, if you determine that you would prefer that we withdraw the refund offer, which according

to our attorney should restore the deductibility of your cash contribution, the Trust will promptly do so. * * *

Mr. Graev did not ask NAT to withdraw the refund offer. We find that NAT's formal offer to withdraw the refund offer--made after NAT consulted with its attorney--further indicates that NAT intended to honor its promises in the side letter (even if the promises may not have been legally enforceable), unless Mr. Graev directed otherwise.

2004 and 2005 Federal income tax returns

Mr. and Mrs. Graev filed joint Forms 1040, U.S. Individual Income Tax Return, for taxable years 2004 and 2005. On their 2004 return, which they filed on or around October 10, 2005 (i.e., after the January and August 2005 letters from NAT, discussed above), Mr. and Mrs. Graev reported a charitable contribution of $990,000 for the facade easement contribution and $99,000 for the cash contribution to NAT. Mr. and Mrs. Graev claimed a deduction for the entire cash contribution in 2004, but because of the limitations on charitable contribution deductions in section 170(b)(1)(C), they claimed a charitable contribution deduction with respect to the facade easement of only $544,449 on their 2004 return.

On their 2005 return, filed on or around October 6, 2006, Mr. and Mrs. Graev claimed a carryover charitable contribution deduction of $445,551 relating to the facade easement contribution in 2004.

Notice of deficiency

By a statutory notice of deficiency dated September 22, 2008, the IRS disallowed Mr. and Mrs. Graev's cash and non-cash charitable contribution deductions relating to their contributions to NAT and determined deficiencies in tax for both 2004 and 2005. In the notice of deficiency the IRS stated: "[T]he noncash charitable contribution of a qualified conservation contribution is disallowed because it was made subject to subsequent event(s)". The notice disallowed the Graevs' cash charitable contribution deduction for the same reason. The IRS also determined that Mr. and Mrs. Graev are liable for accuracy-related penalties under section 6662 for 2004 and 2005.

## OPINION

The question now before the Court is whether deductions for Mr. Graev's contributions of cash and the easement to NAT should be disallowed because they were conditional gifts. The answer depends on whether NAT's promises in the side letter made the gifts conditional and whether the chance that the condition

would occur was "so remote as to be negligible". <u>See</u> 26 C.F.R. secs. 1.170A-1(e), 1.170A-7(a)(3), 1.170A-14(g)(3), Income Tax Regs.

The Graevs argue that under New York law the agreement in the side letter is unenforceable because conditions in the side letter were not included in the recorded deed and that under Federal tax law the side letter was a nullity. We conclude that NAT's promises in the side letter were not a nullity and were not extinguished and that NAT could and would honor its promises both as to the easement and as to the cash contribution.

I.    <u>Charitable contributions</u>

A.    <u>Generally</u>

Section 170(a)(1) generally allows a deduction for any "charitable contribution" made during the taxable year. Section 170(c)(2) defines a "charitable contribution" for this purpose to include "a contribution or gift to or for the use of" a trust organized and operated exclusively for charitable or educational purposes. The parties agree for purposes of the conditional gift issue that NAT is such an organization.

Application of the general rule in section 170(a)(1) may be complicated--especially with regard to the amount and timing of a charitable contribution deduction--if a donor contributes a property interest to a charity but, at the time of

the contribution, there is uncertainty about the amount of property that will actually reach the charity--e.g., when a donor contributes a remainder interest in property to a charity, or (as in this case) the donor contributes property subject to a condition. Section 170 and the corresponding regulations provide instruction and limitations that, at least in part, ensure that the donor will be able to deduct only what the donee organization actually receives. See, e.g., sec. 170(f)(2), (3), (11). Three such limitations are pertinent in this case: (1) 26 C.F.R. section 1.170A-1(e), which limits deductions for conditional gifts; (2) section 170(f)(3)(A) and the corresponding regulations, which limit deductions for contributions of partial interests in property; and (3) section 170(f)(3)(B)(iii) and corresponding regulations, which provide special rules for conservation easements.

B.     Conditional gifts

The general rule of section 170(a)(1) allows a deduction for a charitable contribution only when "payment * * * is made within the taxable year." (Emphasis added.) Regulations corresponding to section 170(a) clarify this rule with a limitation particularly relevant in this case:

> If an interest in property passes to, or is vested in, charity on the date of the gift and the interest would be defeated by the subsequent performance of some act or the happening of some event, the possibility of occurrence of which appears on the date of the gift to be

so remote as to be negligible, the deduction is allowable.  [26 C.F.R. sec. 170A-1(e).]

That is, the deduction may be considered "made" notwithstanding a possibility that the contribution will be defeated by a subsequent event, but only if that possibility is "so remote as to be negligible".  Although the parties agree that the side letter recited conditions on Mr. Graev's contributions, the parties disagree about whether this regulation disallows deductions for those contributions.

A brief discussion of the history of 26 C.F.R. section 1.170A-1(e) is helpful in understanding the regulation's application in this case.  The Secretary promulgated the first version of this regulation in1959 to correspond to section 170(a) of the 1954 Code.[6]  The operative language in that 1959 regulation

---

[6]26 C.F.R. section 1.170-1(e), Income Tax Regs. (1959), provided:

If as of the date of a gift a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible.  If an interest passes to or is vested in charity on the date of the gift and the interest would be defeated by the performance of some act or the happening of some event, the occurrence of which appeared to have been highly improbable on the date of the gift, the deduction is allowable.  The deduction is not allowed in the case of a transfer in trust conveying a present interest in income if by reason of all the conditions and circumstances surrounding the transfer it appears that the charity may not receive the beneficial enjoyment of the interest. * * *

was identical to an older regulation that had limited deductions for estate tax purposes for certain conditional charitable bequests. See 26 C.F.R. sec. 81.46(a), Estate Tax Regs. (1949).[7] Given this similarity, we consider interpretations of 26 C.F.R. section 20.2055-2(b), Estate Tax Regs., and its history instructive in construing 26 C.F.R. section 170A-1(e). See Briggs v. Commissioner, 72 T.C. 646, 657 (1979), aff'd without published opinion, 665 F.2d 1051 (9th Cir. 1981).

The Supreme Court in Commissioner v. Estate of Sternberger, 348 U.S. 187, 194 (1955), discussed the estate tax regulations at length, stating:

> The predecessor of [26 C.F.R.] s[ec.] 81.46 confined charitable deductions to outright, unconditional bequests to charity. It expressly excluded deductions for charitable bequests that were subject to conditions, either precedent or subsequent. While it encouraged assured bequests to charity, it offered no deductions for bequests that

---

[7]26 C.F.R. sec. 81.46(a), Estate Tax Regs. (1949), provided:

If as of the date of decedent's death the transfer to charity is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that charity will not take is so remote as to be negligible. If an estate or interest has passed to or is vested in charity at the time of decedent's death and such right or interest would be defeated by the performance of some act or the happening of some event which appeared to have been highly improbable at the time of decedent's death, the deduction is allowable.

The current version of this regulation is in 26 C.F.R. sec. 20.2055-2(b)(1), Estate Tax Regs.

might never reach charity.  Subsequent amendments have clarified and not changed that principle.  Section 81.46(a) today yields to no condition unless the possibility that charity will not take is "negligible" or "highly improbable." * * *

Similarly, a fundamental principle underlying the charitable contribution deduction is that the charity actually receive and keep the contribution.  26 C.F.R. section 1.170A-1(e) clarifies that principle:  no deduction for a charitable contribution that is subject to a condition (regardless of what the condition might be) is allowable, unless on the date of the contribution the possibility that a charity's interest in the contribution "would be defeated" is "negligible".

Accordingly, under section 1.170A-1(e) of the regulations (construing the statutory requirement of section 170(a)(1) that a gift actually "is made"), the Graevs' deductions are not allowable unless the possibility that NAT's interests in the easement and cash would be defeated was "so remote as to be negligible".

C.    Partial interests in general

Logically related to but distinct from the disallowance of deductions for conditional gifts is the limitation in section 170(f)(3) on deductions for contributions of partial interests in property.  One is generally allowed a deduction only for the contribution of one's entire interest in property.  Congress enacted what is now section 170(f)(3)(A) as part of the Tax Reform Act of 1969, Pub. L.

No. 91-172, sec. 201, 83 Stat. at 549.  Section 170(f)(3)(A) allows a deduction for a charitable contribution "of an interest in property [not made in trust] which consists of less than the taxpayer's entire interest in such property" only to the extent it would be allowable under section 170 "if such interest had been transferred in trust".  This is a narrow allowance, since the rules that allow charitable contribution deductions for partial interests transferred in trust allow deductions only for interests that can be valued using prescribed methods (e.g., actuarial tables promulgated in the regulations) and that have assurances that the charity will receive payments from the trust.  See, e.g., sec. 170(e)(2); 26 C.F.R. sec. 1.170A-6, Income Tax Regs.

In this case, since Mr. Graev reserved the right to have NAT return the easement and the cash if certain events occurred, the contributions of both the easement and the cash were less than Mr. Graev's entire interest in the contributed property.  Accordingly, Mr. Graev's contributions appear subject to the limitation in section 170(f)(3).  However, 26 C.F.R. section 1.170A-7(a)(3) provides the following mitigation of this limitation:

> A deduction shall not be disallowed under section 170(f)(3)(A) * * * merely because the interest which passes to, or is vested in, the charity may be defeated by the performance of some act or the happening of some event, if on the date of the gift it appears that the

possibility that such act or event will occur is so remote as to be negligible. * * *

Thus, under this regulation, even though the contributions did not consist of Mr. Graev's entire interest in the cash and the easement, the Graevs' deductions for contributions would not be disallowed under section 170(f)(3)(A) if the likelihood that NAT's interests in the cash and the easement would be defeated was "so remote as to be negligible".

D.    Conservation easements

An easement is "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose". Black's Law Dictionary 585-586 (9th ed. 2009). Consequently, an easement--whether or not it is subject to any condition--is by definition a partial interest in property, and it would therefore be non-deductible under section 170(f)(3)(A), apart from any further statutory provision. However, further provision is made in subsections (f)(3)(B)(iii) and (h) of section 170, the history of which we briefly survey:

The disallowance of a deduction for partial interests was added to the Code as section 170(f)(3) by the Tax Reform Act of 1969. In that provision's original form, the only exceptions to disallowance of a deduction for contributions of

partial interests were for contributions of "a remainder interest in a personal residence or farm" and "an undivided portion of the taxpayer's entire interest in property". That is, no exception was made for a qualified conservation contribution. However, the Staff of Joint Committee on Taxation opined in its General Explanation of the Tax Reform Act of 1969, at 80 (J. Comm. Print 1970), that "a gift of an open space easement in gross is to be considered a gift of an undivided interest in property where the easement is in perpetuity."

Congress made explicit an exception for (i.e., permitted a deduction for) certain easements in the Tax Reform Act of 1976, Pub. L. No. 94-455, sec. 2124(e), 90 Stat. at 1919, which amended section 170(f)(3)(B) to provide in clause (iii) that a donor may claim a deduction for the contribution of an "easement with respect to real property of not less than 30 years' duration granted to * * * [a charitable organization] exclusively for conservation purposes". The following year Congress revised that exception, eliminating the "30 years' duration" provision and limiting deductibility to an "easement with respect to real property granted in perpetuity". (Emphasis added.) Tax Reduction and Simplification Act of 1977, Pub. L. No. 95-30, sec. 309(a), 91 Stat. at 154. In the Tax Treatment Extension Act of 1980, Pub. L. No. 96-541, sec. 6(a), 94 Stat. at 3206, Congress amended section 170(f)(3) and added subsection (h), which have remained in

effect since then and work in tandem to keep the perpetuity requirement for conservation easement donations.

Section 170(f)(3)(B)(iii) exempts, from the general disallowance of deductions for contributions of partial interests, contributions of "a qualified conservation contribution"--a term defined in section 170(h)(1) as a contribution of a "qualified real property interest," to a "qualified organization", "exclusively for conservation purposes." A "qualified real property interest" must have "a restriction (granted <u>in perpetuity</u>) on the use which may be made of the real property." Sec. 170(h)(2)(C) (emphasis added).[8] Regulations describing the perpetuity requirement provide:

> A deduction shall not be disallowed under section 170(f)(3)(B)(iii)
> * * * merely because the interest which passes to, or is vested in, the
> donee organization may be defeated by the performance of some act

---

[8]In his reply brief, Mr. Graev complains that an IRS argument invoking the perpetuity requirement is "new matter" as to which the IRS should bear the burden of proof under Rule 142(a)(1). We do not believe that the burden of proof affects the resolution of this issue, since the material facts are not actually in dispute, and the outcome is the same no matter which party has the burden. See <u>Dagres v. Commissioner</u>, 136 T.C. 263, 279 (2011). More important, however, the argument that the gifts were subject to a subsequent event--an issue plainly stated in the notice of deficiency--is by its nature an argument that the gifts failed to be perpetual. One reason a conservation easement may fail to be a perpetual gift to the donee, and may thus fail to be deductible, is that it is subject to a condition that creates a non-remote possibility that the easement may revert to the donor. See 26 C.F.R. sec. 1.170A-14(g)(3), Income Tax Regs. The issue of perpetuity is not new matter in this case.

or the happening of some event, if on the date of the gift it appears
that the possibility that such act or event will occur is so remote as to
be negligible.  * * * [26 C.F.R. sec. 1.170A-14(g)(3).]

(The "so remote as to be negligible" phrase is the familiar term first used in the

1949 estate tax regulations cited above.)  Accordingly, a conservation easement

fails to be "in perpetuity"--and is therefore not excepted from the general rule of

section 170(f)(3)(A) disallowing deductions for contributions of partial interests--

if, on the date of the donation, the possibility that the charity may be divested of its

interest in the easement is not so remote as to be negligible.

> E.     Construing "so remote as to be negligible"

Each of the issues discussed above--i.e., whether a charitable contribution

was effectively "made", whether it consisted of an "entire interest", and whether it

was a "qualified conservation contribution"--essentially turns on the same

question:  At the time of Mr. Graev's contributions, was the possibility that NAT's

interest in the cash and the easement would be defeated "so remote as to be

negligible"?  In prior cases, we have defined "so remote as to be negligible" as "'a

chance which persons generally would disregard as so highly improbable that it

might be ignored with reasonable safety in undertaking a serious business

transaction.'"  885 Inv. Co. v. Commissioner, 95 T.C. 156, 161 (1990) (quoting

United States v. Dean, 224 F.2d 26, 29 (1st Cir. 1955)).  Stated differently, it is "a

chance which every dictate of reason would justify an intelligent person in disregarding as so highly improbable and remote as to be lacking in reason and substance." Briggs v. Commissioner, 72 T.C. at 657. What is determinative under the section 170 "remote" regulations is the possibility, after considering all the facts and circumstances, that NAT's reception and retention of the easement and cash would be defeated.

## II. Analysis

The side letter provides that the occurrence that would defeat NAT's interest in the easement and cash is the IRS's successful disallowance of the Graevs' charitable contribution deductions and NAT's consequent promised "removal" of the easement and return of the cash. We hold that at the date of the contribution the possibility that the IRS would disallow the deductions and that NAT would return the cash to Mr. Graev and "remove" the easement was not "so remote as to be negligible".

### A. The possibility of disallowance by the IRS

#### 1. The possibility of disallowance as a matter of fact

The Graevs argue that as of December 2004, the caselaw supported an easement valuation of 10% to 15% of Mr. Graev's property and that it was therefore reasonable to conclude that Mr. Graev's easement donation had a value

of $990,000 (i.e., 11% of the appraised value of the property). They assert that the possibility the IRS would disallow their deductions was so remote as to be negligible. However, on the undisputed facts of this case, it is self-evident that the risk of IRS disallowance was not negligible.[9] A substantial risk obviously arose from the IRS's then-announced intention to scrutinize charitable contribution deductions for facade easement contributions, and that risk is evident from Mr. Graevs' insistence on NAT's issuing the side letter. We need not wonder how a donor or donee would have responded to this risk if he had foreseen it; we know how Mr. Graev did respond when he did foresee it: He did not "disregard" or "ignore[]" it, see 885 Inv. Co. v. Commissioner, 95 T.C. at 161; Briggs v. Commissioner, 72 T.C. at 657, but rather went out of his way to address it and hedge against it.

### a. Increased IRS scrutiny

The Graevs note that at the time of their contribution in December 2004, no charitable contribution deduction arising from a contribution to NAT had been disallowed (to their knowledge). However, the enforcement landscape regarding deductions for facade easement donations was visibly changing at the time of his

---

[9]We do not address the circumstance in which a hyper-cautious donor conditions his gift on non-disallowance where there is no non-negligible possibility of disallowance.

contribution. As is discussed above, the IRS released Notice 2004-41, supra, on

June 30, 2004. In that notice the IRS stated:

> The Internal Revenue Service is aware that taxpayers who (1) transfer an easement on real property to a charitable organization, or (2) make payments to a charitable organization in connection with a purchase of real property from the charitable organization, may be improperly claiming charitable contribution deductions under § 170 of the Internal Revenue Code. The purpose of this notice is to advise participants in these transactions that, in appropriate cases, the Service intends to disallow such deductions and may impose penalties and excise taxes. * * *

Notice 2004-41 goes on to give a specific example of the second instance, i.e., a

taxpayer makes a cash contribution to a charitable organization in addition to

purchasing (at a discount) from the same organization real property that was

subject to a conservation easement, where the total amount of contribution and

purchase price equals the charity's initial cost of the real property. The Graevs

argue that since Notice 2004-41 specifically described a transaction that did not

apply in their case, the notice was not applicable to them.

We disagree. While Notice 2004-41 did list one specific transaction that the

Commissioner had determined was inappropriate, the Commissioner's general

warning against "improperly claiming charitable contribution deductions"

connected with transfers of conservation easements to charities was still very

much applicable to the Graevs. Notice 2004-41 made clear before Mr. Graev's

transfer that his transaction with NAT would be subject to heightened scrutiny and that if any of the Graevs' positions were susceptible to challenge, the Commissioner would likely enforce a contrary position. Mr. Graev's September 15, 2004, email to NAT reflects his understanding of this possibility, stating that in light of Notice 2004-41 his accountants "have advised [him] to be very cautious."

The Graevs argue that their valuation of the contributed easement was reasonable. Since the valuation issue will be resolved by the parties' stipulation to be bound by the outcome of another case that is still pending, see note 2 above, we do not decide valuation now but assume that the Graevs' valuation was reasonable. However, the fact that a valuation is reasonable does not mean that it is correct; a reasonable but incorrect valuation may be challenged and disallowed; consequently, someone who assigns a reasonable value to his donation may nonetheless face a non-negligible risk of disallowance.

Moreover, valuation is not the only potential issue faced by a taxpayer claiming a deduction for a contributed easement, and it was not the only issue as to which NAT promised to return Mr. Graev's contributions. The first numbered paragraph of the side letter did address valuation ("In the event the IRS challenges the appraisal"), but the second numbered paragraph made the distinct promise to

return the contributions "[i]n the event the IRS disallows the tax deductions in their entirety". There are multiple requirements in section 170 and the corresponding regulations that, if not followed, may lead to disallowance--and valuation is only one of them. For example, an easement contribution may be disallowed where--

- The donee fails to be a "qualified organization" described in section 170(h)(3).

- The property subject to the easement fails to be of a "historically important land area" or a "certified historic structure." Sec. 170(h)(4)(iv); see Turner v. Commissioner, 126 T.C. 299, 316 (2006).

- The taxpayer fails to contribute a "qualified real property interest". Sec. 170(a)(2); see Belk v. Commissioner, 140 T.C. __ (Jan. 28, 2013).

- The easement fails to preserve conservation purposes "in perpetuity". Sec. 170(h)(5); see Carpenter v. Commissioner, T.C. Memo. 2012-1; Herman v. Commissioner, T.C. Memo. 2009-205.

- The parties fail to subordinate the rights of a mortgagee in the property "to the right of the qualified organization to enforce the conservation purposes of the gift in perpetuity." 26 C.F.R. sec. 1.170A-14(g)(2); see Mitchell v. Commissioner, 138 T.C. 324, 331-332 (2012).

- The taxpayer fails to "[a]ttach a fully complete appraisal summary * * * to the tax return". 26 C.F.R sec. 1.170A-13(c)(2)(B). But see Kaufman v. Shulman, 687 F.3d 21, 28-30 (1st Cir. 2012), aff'g in part, vacating in part, and remanding in part Kaufman v. Commissioner, 136 T.C. 294 (2011), and 134 T.C. 182 (2010).

- The appraisal fails to be a "qualified appraisal". 26 C.F.R. sec. 1.170A-13(c)(3); see Friedberg v. Commissioner, T.C. Memo. 2011-238.

- The appraiser fails to be a "qualified appraiser". 26 C.F.R. sec. 1.170A-13(c)(5); see Rothman v. Commissioner, T.C. Memo. 2012-218 (reserving the question on whether an appraiser was "qualified").

- The parties fail to record the easement or otherwise fail to effect "legally enforceable restrictions". 26 C.F.R. sec. 1.170A-14(g)(1); see Satullo v. Commissioner, T.C. Memo. 1993-614, aff'd without published opinion, 67 F.3d 314 (11th Cir 1995).

- The taxpayer fails to "[m]aintain records" necessary to substantiate the charitable contribution. 26 C.F.R. sec. 1.170A-13(c)(2)(C), Income Tax Regs.

Mr. Graev's September 15, 2004, correspondence with NAT reflects his clear understanding that charitable contribution deductions for contributions "to organizations that promote conservation easements" were going to be the subject of IRS scrutiny and could be disallowed for failing to satisfy any one of the requirements in section 170. Mr. Graev's accountants advised him "to be very cautious" with such transactions. Clearly, the risk that the IRS might disallow a deduction for the contribution of an easement was well above "negligible".

###### b. The side letter

Informed by his accountants' warning, Mr. Graev initially asked NAT about the possibility of a side letter from NAT that promised the return of contributions

if deductions were disallowed. NAT eventually gave Mr. Graev such a letter on September 24, 2004. The mere fact that he required the side letter is strong evidence that, at the time of Mr. Graev's contribution, the risk that his corresponding deductions might be disallowed could not be (and was not) "ignored with reasonable safety in undertaking a serious business transaction." 885 Inv. Co. v. Commissioner, 95 T.C. at 161.

Mr. Graev was not alone in his assessment of the risk of disallowance. NAT considered it "standard Trust policy" to return a cash contribution to the extent a deduction therefor was disallowed by the IRS. In numerous instances NAT issued "comfort letters" assuring donors of this policy. The very essence of a comfort letter implies a non-negligible risk; and the author uses the letter to induce the recipient to enter into a transaction. In this case the risk was either partial or complete disallowance of Mr. Graev's claimed charitable contribution deductions. NAT's course of dealing confirms that the possibility that the IRS might disallow Mr. Graev's deductions was not "so remote as to be negligible". See 26 C.F.R. secs. 1.170A-1(e), 1.170A-7(a)(3), 1.170A-14(g)(3).

2.     Disallowance as a subsequent event

The Graevs argue:

> Forty-four years ago, this Court ruled that the [subsequent] events referred to by Treas. Reg. §1.170A-l(e) do not include contingencies created by Respondent's examination or contingencies within Respondent's control.  O'Brien v. Commissioner, 46 T.C. 583, 592 (1966), acq., 1968-1 C.B. 2.[10]

O'Brien v. Commissioner, 46 T.C. 583 (1966), did involve a charitable contribution that was contingent on subsequent favorable tax treatment; but the Graevs' characterization of our ruling in O'Brien is flatly incorrect, and their reliance on it is therefore mistaken.

O'Brien addressed two issues--a charitable remainder trust issue (which we describe here first) and a related but distinct tax-treatment contingency issue.  The taxpayers created a charitable remainder trust in June 1964--of which they made themselves trustees with broad powers to manage the trust--and then made contributions to the trust in December 1964.  Id. at 584.  The Commissioner argued that the taxpayers were not entitled to charitable contribution deductions derived from the taxpayers' contributions to the trust because the complete

---

[10]The Graevs also cite an IRS private letter ruling.  We decline to consider it, in light of section 6110(k)(3), which provides:  "(3) Precedential status.--Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent."  See Abdel-Fattah v. Commissioner, 134 T.C. 190, 202 (2010); Vons Cos., Inc. v. United States, 51 Fed. Cl. 1, 12 (2001).

management power given to the donor-trustees enabled them to defeat the remainder interests and therefore prevented the deduction. Id. at 591. We rejected that argument and concluded--

> that it is highly improbable that the petitioners in their fiduciary capacity will ever perform an act which will defeat the charitable remainders they have created in the trust. All of the conditions and circumstances surrounding the transfers of property interests to the trust persuade us that the named charities, or other qualified ones, will eventually receive the beneficial enjoyment thereof. * * * [Id. at 596; emphasis added.]

We thus decided this remainder trust issue under "[t]he guidelines * * * set forth in section 1.170-1(e), Income Tax Regs."[11] Id. at 594.

The Commissioner's tax contingency argument (discussed first in O'Brien) was based on paragraph 16 of the trust instrument, under which contributions to the trust were "subject to the condition that such contribution shall be repaid to the contributor by the Trustees * * * only in the event and to the extent that the Commissioner of Internal Revenue does not allow [it] as a deduction". Id. at 588. In the notice of deficiency issued in September 1965, the Commissioner had disallowed the charitable contribution deductions (for the sole reason that the

---

[11]For the remainder trust issue we cited 26 C.F.R. section 1.170-1(e) (1961) (see note 6 above for the 1959 version which was identical to the 1961 regulation); but the limitations now set forth in 26 C.F.R. sections 1.170A-1(e), 1.170A-7(a)(3), and 1.170A-14(g)(3), Income Tax Regs., are equivalent.

donor-trustees had power over the trust). We "disposed of [the contingency issue] summarily", id. at 591, so it is not entirely clear what the Commissioner had argued; but it appears that the Commissioner's contention was simply that "the literal meaning of paragraph 16", id., called for return of the contributions upon the mere act of disallowance by the Commissioner, whether or not the Commissioner's position was valid or was upheld. This position would have put the contingency "'within the control * * * of the Commissioner'", O'Brien v. Commissioner, 46 T.C. at 591(quoting Surface Combustion Corp. v. Commissioner, 9 T.C. 631, 655 (1947), aff'd, 181 F.2d 444 (6th Cir. 1950)),[12] without regard to the merits of the Commissioner's decision. We held, to the contrary, that despite "the narrow wording of the trust instrument", "[t]he petitioners have a right to litigate respondent's determination", so that the contributions would not be subject to return "unless the petitioners are unsuccessful in this litigation." Id. at 592.

---

[12]In Surface Combustion Corp. v. Commissioner, 9 T.C. 631 (1947), aff'd, 181 F.2d 444 (6th Cir. 1950), we held that a provision in an employee trust allowing an employer to reclaim his contributions to the trust if the contributions were determined to be nondeductible did not prevent the employer from deducting his contributions to the trust since the contingency was in the control of the Commissioner. Surface Combustion did not involve charitable contributions, section 170, nor any regulations with a "so remote as to be negligible" standard.

That is, in O'Brien the Commissioner evidently argued that the charitable contribution deductions were improper simply because, under the trust instrument, the charitable contributions were defeated by the IRS's mere disallowance (whether or not that disallowance was upheld in litigation). We held, however, that if the taxpayers successfully challenged that disallowance, then the contributions were not defeated (and the contribution deductions could therefore be allowed). We thus held that a contingency expressed in terms of "disallowance" of a deduction actually looked to the merits of the deduction. Contrary to the Graevs' argument, our O'Brien Opinion did not analyze the tax contingency issue under the section 170 regulations,[13] and we did not hold that a tax-treatment contingency can never be a subsequent event that will defeat a contribution and a deduction. We simply did not address that issue.

---

[13]Our Opinion in O'Brien v. Commissioner, 46 T.C. 583, 592 (1966), indicates that the Commissioner also cited--but we distinguished--Jones v. United States, 252 F. Supp. 256 (N.D. Ohio 1966), aff'd in part, rev'd in part, 395 F.2d 938 (6th Cir. 1968), a case not involving a tax-treatment-contingent contribution, in which (as we noted) the District Court held that the possibility that a contribution at issue there would be defeated "was not 'so remote as to be negligible' under section 1.170-1(e), Income Tax Regs." This description of Jones includes our only mention of that regulation in our discussion of this issue in the O'Brien Opinion, and our discussion does not address any relation between the regulation and the tax-treatment-contingent deduction at issue in O'Brien.

This case, unlike O'Brien, clearly presents the issue of whether the promised return of a charitable contribution upon the disallowance of the charitable contribution deduction can constitute a subsequent event the possibility of which, if not negligible, renders the deduction not allowable. O'Brien sheds no light on that question.

B.      The possibility of return of the contributions

If the risk of IRS disallowance was non-negligible, then so was the prospect that NAT would be called on to honor its side letter and "promptly refund * * * [Mr. Graev's] entire cash endowment contribution and join with * * * [Mr. Graev] to immediately remove the facade conservation easement from the property's title". Given that non-negligible risk, Mr. Graev's contributions fell afoul of the section 170 regulations implementing the statutory requirements that a gift be effectively "made", that it consist of an "entire interest", and that it be a "qualified conservation contribution". The Graevs argue, however, that as a matter of law NAT could not be held to the promises it made in its side letter, so that there was in fact no possibility that the property would be returned.

The Graevs contend that NAT could not be divested of its interest in the easement because the side letter is not enforceable under New York law and that,

as a result, the contributions were not really conditional.[14]  In particular, the

Graevs argue that New York's environmental conservation statutes, N.Y. Envtl.

Conserv. Law secs. 49-0301 to 49-0311 (McKinney 2008 & Supp. 2013), would

prevent the side letter from being enforced, and alternatively, that the common law

doctrine of merger extinguished the side letter upon NAT's recording the

easement deed.  They also contend that under principles of tax law the promises in

the side were a nullity.  We disagree.

### 1.    Conservation easements under New York law

In general, property interests are determined by State law.  United States v.

Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985).  In 1983 New York enacted

the New York Conservation Easement Statute.  See N.Y. Envtl. Conserv. Law

secs. 49-0301 to 49-0311.  For purposes of these statutes a "conservation

easement" is defined as:

---

[14]In this argument the Graevs do not distinguish between the contribution of the easement (which was subject to the statutes that the Graevs cite) and the contribution of the cash (which was not).  Reliance on New York real estate principles to argue that the side letter is not enforceable as to the cash contribution is misplaced.  Even if the side letter were not enforceable as to the easement, for the reasons the Graevs advance, so that they could not require NAT to "remove" it, the Graevs show no reason that the side letter would not be enforceable so as to require the return of the cash.

> an easement, covenant, restriction or other interest in real property, created under and subject to the provisions of this title which limits or restricts development, management or use of such real property for the purpose of preserving or maintaining the scenic, open, historic, archaeological, architectural, or natural condition, character, significance or amenities of the real property * * *  [Id. sec. 49-0303(1).]

Under these New York statutes, a conservation easement is enforceable even though "[i]t is not appurtenant to an interest in real property" and even though "[i]t can be or has been assigned to another holder".[15]  N.Y. Envtl. Conserv. Law sec. 49-0305(5).  Since an easement with these characteristics would not have been enforceable under New York common law, see Gross v. Cizauskas, 385 N.Y.S.2d 832 (App. Div. 1976), a conservation easement in New York is authorized only by statute and thus is subject to several statutory restrictions.  We assume the easement in this case is enforceable only under New York's Environmental Conservation Law and (as the Graevs contend) is subject to the restrictions therein, especially restrictions on how an easement can be extinguished.

---

[15]The legislative history of these provisions suggests that they were included in the statutes so that the conservation easements would satisfy the perpetuity requirement of 26 C.F.R. sec. 170A-14(g).  See John C. Partigan, "New York's Conservation Easement Statute:  The Property Interest and Its Real Property and Federal Income Tax Consequences", 49 Albany L. Rev. 430, 452 n.87 (1985).

The manner and circumstances in which parties can modify or extinguish a conservation easement under New York's Environmental Conservation statutes are clear:

> A conservation easement shall be modified or extinguished only pursuant to the provisions of section 49-0307 of this title. Any such modification or extinguishment shall be set forth in an instrument which complies with the requirements of section 5-703 of the general obligations law or in an instrument filed in a manner prescribed for recording a conveyance of real property pursuant to section two hundred ninety-one of the real property law. [N.Y. Envtl. Conserv. Law sec. 49-0305(2).]

The Graevs argue that NAT's promise in the side letter to "remove the facade conservation easement from the property's title" purports to retain for Mr. Graev a right to extinguish the easement that does not comply with the provisions of N.Y. Envtl. Conserv. Law section 49-0307, and as a result, any attempt to remove the easement pursuant to the promise in the side letter would be unlawful.

Pursuant to N.Y. Envtl. Conserv. Law section 49-0307, cross-referenced in the statute quoted above, a conservation easement held by a "not-for-profit conservation organization"[16] may be modified or extinguished only: (1) "as provided in the instrument creating the easement"; (2) "in a proceeding pursuant to

_____

[16]The Commissioner does not dispute that NAT is a "not-for-profit conservation organization" for purposes of New York's Environmental Conservation Law.

section nineteen hundred fifty-one of the real property actions and proceedings law"; or (3) "upon the exercise of the power of eminent domain." NAT's promise in the side letter to remove the easement, standing alone, does not appear to comply with any of the three permissible modification or extinguishment methods provided in N.Y. Envtl. Conserv. Law section 49-0307.

The Commissioner argues that the side letter should be considered part of "the instrument creating the easement". That argument fails because the side letter was not "subscribed by the person * * * granting [the deed]", N.Y. Gen. Oblig. Law sec. 5-703 (McKinney 2012), nor was it recorded, which are both required under N.Y. Envtl. Conserv. Law section 49-0305 (cross-referencing N.Y. Gen. Oblig. Law sec. 5-703) in order for a document to be considered an "instrument creating the easement".

However, we hold that NAT had the ability to honor its promises in the side letter because the subscribed and recorded deed--which clearly is "the instrument creating the easement"--reserved for NAT the power to do so. Paragraph IV.B. of the duly recorded deed granting the easement explicitly gives NAT the right to "abandon" the easement, and that deed does comply with one of the three permissible methods--i.e., the first (allowing modification or extinguishment "as provided in the instrument creating the easement"). The recorded deed provides:

Grantee further agrees that it will not transfer this Easement unless the transferee first agrees to continue to carry out the conservation purposes for which this Easement was created, provided, however, that <u>nothing herein contained shall be constructed to limit the Grantee's right</u> to give its consent (e.g., to changes in a Protected Facade(s)) or <u>to abandon some or all of its rights hereunder</u>. [Emphasis added.]

We have found that at the time Mr. Graev made the contribution, NAT intended to honor its promise to "join with * * * [Mr. Graev] to immediately remove the facade conservation easement from the property's title", and we hold that NAT had the ability to honor this promise by exercising its right to abandon the easement as set forth in paragraph IV.B. of the recorded deed.[17]

---

[17]Our holding here is distinguishable from <u>Commissioner v. Simmons</u>, 646 F.3d 6, 10 (D.C. Cir. 2011), <u>aff'g</u> T.C. Memo. 2009-208, which looked at similar abandonment language in an easement deed and concluded "deductions cannot be disallowed based upon the remote possibility * * * [the charity] will abandon the easements." <u>See also</u> <u>Kaufman v. Shulman</u>, 687 F.3d 21, 28 (1st Cir. 2012), <u>aff'g in part, vacating in part, and remanding in part</u> <u>Kaufman v. Commissioner</u>, 136 T.C. 294 (2011), <u>and</u> 134 T.C. 182 (2010). In <u>Commissioner v. Simmons</u>, 646 F.3d at 10, the Court of Appeals for the D.C. Circuit stated that "the Commissioner has not shown the possibility * * * [the charity] will actually abandon its rights is more than negligible. [The charity] * * * has been holding and monitoring easements in the District of Columbia since 1978, yet the Commissioner points to not a single instance of its having abandoned its right to enforce." In the instant case, however, NAT gave Mr. Graev an explicit, written promise that it would abandon its rights in the easement if certain events occurred. We find nothing to indicate that NAT did not intend to comply with its written promises.

Accordingly, we find that the Commissioner has shown that the possibility that NAT would actually abandon its rights was more than negligible.

### 2. Merger doctrine

Alternatively, the Graevs argue that the entire side letter was extinguished under the common law doctrine of merger. This argument is also without merit. While the doctrine of merger generally extinguishes terms of preliminary contracts or negotiations upon the recording of a deed, so that only the terms in the recorded deed remain, there are exceptions to this general rule. 91 N.Y. Jur. 2d Real Property Sales and Exchanges, sec. 140 (2011). Assuming the doctrine of merger applies to the side letter, the provisions in the side letter would fall within one of these exceptions and survive the deed.

The merger rule does not apply where there is a clear intent evidenced by the parties that a particular provision of the contract shall survive the deed. See Novelty Crystal Corp. v. PSA Institutional Partners, L.P., 850 N.Y.S.2d 497, 500 (App. Div. 2008). "Intention of the parties may be derived from the instruments alone or from the instruments and the surrounding circumstances". Goldsmith v. Knapp, 637 N.Y.S.2d 434, 436 (App. Div. 1996). In Seibros Fin. Corp. v. Kirman, 249 N.Y.S. 497, 499 (App. Div. 1931), a New York court held that because an agreement giving the purchaser a right to reconvey property that was claimed to be

the "inducing cause which persuaded the plaintiff to purchase the property * * * [, t]he contract clearly shows that there was no intention on the part of the parties to merge the contract in the deed. A contract for the sale of real estate is merged in the deed only when the latter is intended to be accepted in full performance of the former."

Likewise, we find that the side letter was an inducing cause that persuaded Mr. Grave to contribute the conservation easement and cash to NAT. Before he even filled out his application to NAT, Mr. Graev emailed NAT asking for its thoughts on the side letter; and after receiving NAT's assurances that the side letter would not affect the deductibility of his contribution, he specifically requested the side letter. Moreover, after the donation, when NAT recognized that the side letter might be detrimental to Mr. Graev's tax deductions, NAT offered to rescind the side letter and Mr. Graev did not accept NAT's offer, indicating that the parties understood the side letter had survived the deed. Accordingly, we find that NAT's promises in the side letter to return to the easement and cash were enforceable because we find a clear intent evidenced by the parties that the side letter would survive the deed.

### 3. Nullity

The Graevs appear to argue that NAT's side letter is a nullity and should be disregarded for tax purposes because it provides for the donor's potential recovery of the contributions in the event of unwanted tax consequences. In support of this argument the Graevs rely primarily on Commissioner v. Procter, 142 F.2d 824, 827-828 (4th Cir. 1944), rev'g a Memorandum Opinion of this Court. The holding of the Court of Appeals in Procter, however, is inapposite to this case.

In Procter the donors assigned to their children gifts of remainder interests in two trusts, subject to the following clause:

> [I]n the event it should be determined by final judgment or order of a competent federal court of last resort that any part of the transfer in trust hereunder is subject to gift tax, it is agreed by all the parties hereto that in that event the excess property hereby transferred which is decreed by such court to be subject to gift tax, shall automatically be deemed not to be included in the conveyance in trust hereunder and shall remain the sole property of * * * [the taxpayer] * * *. [Id. at 827.]

Under that clause, if the gifts were held by the courts to be taxable, then the gifts would be undone, and the donors would then be not liable for the tax for which the courts had held them liable. The clause purported not only to undo the gifts but also to undo the judicial decision.

The Court of Appeals for the Fourth Circuit held that the clause in Procter was "clearly a condition subsequent and void because contrary to public policy", id., for three reasons:

(1) Such a clause "has a tendency to discourage the collection of the tax by the public officials charged with its collection", thereby discouraging efforts to collect the tax. Id.

(2) "[T]he effect of the condition would be to obstruct the administration of justice by requiring the courts to pass upon a moot case". Id.

(3) "[T]he condition is to the effect that the final judgment of a court is to be held for naught because of the provision of an indenture necessarily before the court when the judgment is rendered." Id. That is, a final judgment would cause the condition to be operative, but the condition should not be allowed to operate to undo the judgment, since the instrument containing the condition was before the court, and all matters pertaining thereto merged in the judgment. Id. at 827-828.

None of these three reasons would apply to nullify NAT's side letter:

First, the conditions in NAT's side letter would not discourage the collection of tax. This Opinion decides that the Graevs are not entitled to charitable contribution deductions (and that there are therefore deficiencies in their income tax), and the return of the contributions to the Graevs would not at all

undo or contradict that holding but would instead be consistent with that holding. In order for the condition in the side letter to be triggered, the deductions must be disallowed, and income tax will thereafter be owing whether or not the contribution is returned.

Second, the possibility of the subsequent return of the contributions does not render this case moot. The Graevs claimed deductions; the IRS disallowed them and determined deficiencies of tax; the Graevs challenged that determination, and we must decide the matter. If we had upheld the deductions, the condition in the side letter would never have been met, the gift would be complete, the contribution would be deductible (assuming other qualifications are met), and we would enter decision in favor of the Graevs to overturn the IRS's deficiency determination. Because instead we disallow the deductions and enter decision in the IRS's favor, upholding the deficiency determination, the condition in the side letter is triggered and the gift presumably reverts to the donor. However, in this case, unlike Procter, the reversion to the donor would not be inconsistent with the court's holding--i.e., the tax collector in our case, unlike Proctor, would collect the tax consistent with the judgment even if the condition become operative and the gift were returned to the donor.

Third, although the final judgment in the IRS's favor would cause the side letter to be operative, the return of the contribution pursuant to the side letter would not operate to undo the judgment, as was the case in Procter. The return would have no effect on the Graevs' tax liabilities.

Other cases have similarly distinguished Procter and have held that certain tax contingency provisions are not void as against public policy. See Estate of Christiansen v. Commissioner, 130 T.C. 1, 8 n.7, 17-18 (2008) (a clause that "increases the amount donated to charity should the value of the estate be increased", "would not make us opine on a moot issue [i.e., the value of the estate], and wouldn't in any way upset the finality of our decision in this case"), aff'd, 586 F.3d 1061 (8th Cir. 2009); Estate of Dickinson v. Commissioner, 63 T.C. 771, 777 (1975) (stating that the "agreement makes no attempt to nullify * * * [the Court's] determination" (citing Surface Combustion Corp. v. Commissioner, 9 T.C. 631, and O'Brien v. Commissioner, 46 T.C. 583)); Estate of Petter v. Commissioner, T.C. Memo. 2009-280 ("a judgment adjusting the value of each unit will actually trigger a reallocation of the number of units between the trusts and the foundation under the formula clause. So we are not issuing a merely declaratory judgment"), aff'd, 653 F.3d 1012 (9th Cir. 2011).

### 4. Voluntary removal of the easement

The event that might defeat the contribution to NAT is the "removal" of the easement and the return of the cash pursuant to NAT's side letter. Even if, as a matter of law, the side letter was not enforceable for any of the reasons the Graevs advance, the question would remain whether, as a matter of fact, in December 2004 there was a non-negligible possibility that the IRS would disallow the Graevs' contribution deduction and NAT would voluntarily remove the easement. We have found that there was. Mr. Graev evidently concluded that NAT's promise should be believed; he took deliberate steps to obtain its promise; and his conclusion is evidence of what was likely. NAT made such promises to Mr. Graev and others precisely because it was soliciting contributions from within a community of potential donors, and the ability of such an organization to obtain solicitations might well be undermined if it got a reputation for failing to keep its promises. To decide that there was no non-negligible possibility that NAT would voluntarily extinguish the easement and return the cash would require us to find that, in order to induce Mr. Graev to make his contribution, NAT made cynical promises that it fully intended to break. Our record will not support such a finding; the stipulated evidence simply shows a non-profit organization going about accomplishing its purpose. If we speculate (without evidence) that NAT

might have reneged on its promise, or even if we assume that NAT probably would have reneged on its promise, that still leaves us with at least a non-negligible possibility that NAT would have done what it said it would do. That possibility is fatal to the Graevs' contribution deductions.

III.    Conclusion

Thus, on the evidence before us, we find that there was a substantial possibility that the IRS would challenge the Graevs' easement contribution deductions. We hold that neither State nor Federal law would prevent enforcement of the side letter. And we find that apart from any legal enforceability of the side letter, it reflected what NAT was likely to do in the event of IRS disallowance.

For these reasons, we conclude that at the time of Mr. Graev's contributions to NAT, the possibility that the IRS would disallow the Graevs' deductions for the contributions and, as a result, that NAT would "promptly refund * * * [Mr. Grave's] entire cash endowment contribution and join with * * * [Mr. Graev] to immediately remove the facade conservation easement from the property's title" (as it promised) was not "so remote as to be negligible". Accordingly, under 26 C.F.R. sections 1.170A-1(e) and 1.170A-7(a)(3) the deduction relating to the cash contributions is disallowed. Likewise, under 26 C.F.R. sections 1.170A-1(e),

1.170A-7(a)(3), and 1.170A-14(g)(3), the easement contribution deductions are disallowed.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.