T.C. Memo. 2016-80

UNITED STATES TAX COURT

RP GOLF, LLC, SB GOLF, LLC, TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27873-08.                    Filed April 28, 2016.

Lisa J. Hansen and Michael J. Abrams, for petitioner.

Shaina E. Boatright and David L. Zoss, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge:  This case involves a noncash charitable contribution

deduction.  In a notice of final partnership administrative adjustment (FPAA) for

2003 respondent disallowed a $16,400,000 charitable contribution deduction on

the partnership return of RP Golf, LLC (RP Golf).  The deduction was claimed for

the donation of a conservation easement on real property currently operating as a

[*2] golf course and conveyed by the National Golf Club of Kansas City LLC (National Golf), a single-member limited liability company (LLC) whose sole member was RP Golf.[1]

The issues for decision are as follows: (1) whether the requirements of section 170(h) for a qualified conservation easement are met;[2] (2) whether RP Golf is entitled to a charitable contribution deduction with respect to a donation of a conservation easement to a charitable organization by its single-member LLC; and (3) if the Court determines that RP Golf is entitled to a charitable contribution deduction, then what is the value of the conservation easement.

FINDINGS OF FACT

Some of the facts are stipulated and are so found. The stipulation of facts, the amended first supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. At the time the petition was filed, RP Golf's principal place of business was in Missouri. RP Golf is a

---

[1]Although National Golf is identified as a Missouri corporation in the conservation easement agreement, National Golf is actually a single-member LLC organized in Missouri and disregarded for Federal income tax purposes. The easement filed of record was not corrected before trial to reflect National Golf's correct entity identification.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]** Missouri LLC and was formerly referred to as River Park Golf, LLC.[3] SB Golf, LLC, is RP Golf's tax matters partner and petitioner in this case. See sec. 6226.

I.     Property Ownership History

In June 1997 RP Golf acquired a substantial portion of the land that makes up the current golf course development on which the conservation easement at issue is located. The golf course property formerly known as Windbrook Properties (Windbrook Properties) was conveyed to RP Golf by a trustee's deed that included disclosures from a bankruptcy estate. The trustee's deed conveyed multiple tracts of land in Platte County, Missouri, to RP Golf.

In October 1998 RP Golf conveyed certain property, including a portion, but not all, of the Windbrook Properties, without disclosures by special warranty deed to its wholly owned subsidiary, National Golf. The special warranty deed was recorded in the Platte County Recorder's Office on October 30, 1998.

RP Golf developed two private golf courses on the Windbrook Properties, known as the National and the Deuce at the National (Deuce), respectively.[4] The

---

[3]River Park Golf, LLC, was the entity's prior legal name, but for consistency all references will be to the entity's current name, RP Golf.

[4]RP Golf's tax return and the attached appraisal described the National as

(continued...)

[*4] National was completed and placed into service in 2000. The first nine holes of the Deuce were completed and placed into service in 2002. The remaining nine holes of the Deuce were completed and placed into service in 2003.

Each golf course organized private clubs, and during 2003 National Golf operated both of the for-profit private golf clubs. One club was associated with the National course, and the other club was associated with the Deuce course.

II.     Development Financing Agreements

Hillcrest Bank financed RP Golf's original 1997 purchase of the Windbrook Properties. Then in January 2001 Hillcrest Bank made a development loan of $12,500,000 to RP Golf (Hillcrest loan). RP Golf, National Golf, and another related entity granted a security interest in all of the Windbrook Properties, among others, and as security to the indebtedness executed a deed of trust dated January 24, 2001, which was recorded in the Platte County Recorder's Office on February 5, 2001 (2001 deed of trust). The 2001 deed of trust contains standard provisions prohibiting any transfer of any interest in the property without the consent of the

---

[4](...continued)
the National I and the Deuce as the National II. The Court will refer to the first golf course as the National I and the second golf course as the National II throughout for consistency when discussing legal descriptions or appraisals.

**[*5]** Hillcrest Bank and states that a violation of the transfer prohibition would result in an event of default.

The Hillcrest loan amount was subsequently modified, and the principal was reduced to $9,900,000. The 2001 deed of trust was amended accordingly. In an agreement dated April 8, 2003, the Hillcrest loan was further modified to extend the maturity date to February 7, 2004, and the 2001 deed of trust was further amended by a modification agreement dated April 8, 2003, and recorded on February 11, 2004. The Hillcrest loan was modified again to increase the principal to $10,900,000 and to extend the maturity date to February 7, 2005. The 2001 deed of trust was further amended to reflect the changes by a modification agreement dated February 7, 2004, and recorded on March 16, 2004 (2004 Hillcrest modification). Each of the above-described modifications contained the following disclosure:

> Statutory Notice. Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt, including promises to extend or renew such debt, are not enforceable. To protect you (borrower(s)) and us (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it. * * *

**[\*6]** Both RP Golf and National Golf, the grantor of the easement, executed the original 2001 Hillcrest loan and the 2004 Hillcrest modification.[5]

Earlier development financing was also obtained from Great Southern Bank, which made four loans to National Golf and/or RP Golf. Great Southern Bank held the following deeds of trust on the Windbrook Properties: (1) RP Golf in the principal amount of $4,200,000 secured by a deed of trust dated May 27, 1998; (2) National Golf in the principal amount of $8 million secured by a deed of trust dated October 27, 1998; (3) RP Golf in the principal amount of $3,800,000 secured by a deed of trust dated January 25, 2000; and (4) National Golf in the principal amount of $10 million secured by a deed of trust dated September 25, 2002. The promissory notes securing the deeds of trust contained a limitation on oral agreements that was substantially similar to the limitation contained in the Hillcrest documents.

Both Hillcrest Bank and Great Southern Bank had extensive financing agreements and senior deeds of trust recorded in the Platte County Recorder's Office before National Golf's grant of easement described <u>infra</u>.

---

[5]The April 8, 2003, modification agreement was executed by RP Golf, but was not executed by National Golf.

**[*7]** III.    The Conservation Easement

On December 29, 2003, National Golf, as grantor, executed an agreement entitled "Grant of Permanent Conservation Easement" purporting to grant a conservation easement to the Platte County Land Trust (PLT), a Missouri not-for-profit corporation (PLT agreement).[6]  National Golf expressly reserved the right for itself, and its successors or assigns, to use the property as a golf course, and it continues to operate two private golf clubs on the property.

The PLT agreement includes, inter alia, the following statement about the transfer of the conservation easement:

> WHEREAS, the Grantor is the owner in fee of certain real property located in Platte County, Missouri, which has aesthetic, open space, scenic, recreational, and natural resource values in its present state; * * *

The property underlying the PLT agreement is in the City of Parkville, Platte County, Missouri.  The legal description attached to the PLT agreement conveyed portions of multiple sections of land, including a part of the northwest quarter of section 26.  National Golf has never been the owner in fee of the northwest

---

[6]PLT is a Missouri not-for-profit corporation qualified under sec. 501(c)(3) to receive charitable contributions described in sec. 170(c).

[*8] quarter of section 26.[7]  The PLT agreement also included the following

declarations:

> WHEREAS, the Grantor desires to protect and preserve the natural values of the property by making permanent arrangements for the conservation of the open space, scenic natural resources, natural habitat and aesthetic qualities of the Property and to limit the future use thereof to such purposes;[8] * * *

> *　　　*　　　*　　　*　　　*　　　*　　　*

> NOW, THEREFORE, for and in consideration of the covenants and representations contained herein and for other good and valuable

---

[7]The extensive legal description attached to the conservation easement, referred to as schedule A, is a 10-page metes and bounds survey with an additional 16 pages of survey describing exceptions to the conservation easement.  The survey describes the property in a series of golf tracts with subtracts described to identify the exclusions from the PLT agreement.  The series of golf tracts is the National I, golf tracts A through D, and the National II, golf tracts E through I.  Golf tracts G and H appear to include some portion of section 26 in the legal description.

[8]The original trustee's deed conveying Windbrook Properties to RP Golf included the following disclosure that National Golf did not include in the PLT agreement:

> Grantee further acknowledges and understands that there may be harmful, hazardous or toxic substances or solid wastes on or released from the premises and except for the limited statement of Grantor's knowledge herein set forth, Grantor makes no representations whatsoever concerning the extent, location or nature of the same. * * * Grantee * * * expressly waives any right or claim against Grantor, * * *.  The waiver * * * shall be deemed to be covenants running with the land and binding upon successors and assigns of grantee and all operators of the premises.

[*9] consideration, the receipt and legal sufficiency of which are hereby acknowledged, Grantor [National Golf] on behalf of itself and its heirs, successors and assigns, in consideration of the premises contained herein and other valuable consideration paid to its full satisfaction, does freely give, grant, sell, transfer, convey and confirm forever unto [PLT] * * * a perpetual conservation easement (as more particularly set forth below) in that certain tract of land containing approximately three hundred (300) acres, more or less,[9] being more particularly described in Schedule A * * * attached hereto and incorporated herein * * *

*       *       *       *       *       *       *

This instrument sets forth the entire agreement of the parties with respect to the Easement and supersedes all prior discussions, negotiations, understandings, or agreements relating to the Easement, all of which are merged herein.

The easement's purpose, according to the PLT agreement, is primarily to "further the policies of the State of Missouri designed to foster the preservation of open space or open areas, conservation of the state's forest, soil, water, plant and wildlife habitats, and other natural and scenic resources" and "to implement the objectives set forth in 67.870 to 67.910 R.S.M.O." The objectives outlined in the Missouri statutes aim to preserve and maintain open areas and spaces in the light

---

[9]The appraisal dated December 15, 2003, supporting RP Golf's charitable contribution valuation reflected a donation of 277.86 acres. The appraisal included a description of property located in section 26, even though National Golf was not the owner of that property. See supra p. 7.

[*10] of encroaching urban and metropolitan development.  Mo. Ann. Stat. sec. 67.870 (West 2007).

Missouri law governs the interpretation and performance of the easement, which, per the PLT agreement, "shall be liberally construed to implement Missouri's open areas policy."  To ensure National Golf's compliance with the statutory objectives and the PLT agreement terms, PLT agreed to inspect and, if necessary, enforce the easement for an annual fee of approximately $15,000. Additionally, the grantor, National Golf, agreed to incorporate the terms of the easement by reference in any deed or other legal instrument by which it divests itself of any interest in all or a portion of the property.

PLT's vice president executed a separate agreement entitled "Acceptance", accepting the easement and agreeing to its covenants and restrictions.  The PLT agreement and the acceptance were recorded in the Platte County Recorder's Office on December 30, 2003.

IV.   Consents To Subordinate

When National Golf executed the PLT agreement on December 29, 2003, the property was subject to senior deeds of trust held by Hillcrest Bank and Great Southern Bank that predated the PLT agreement.  Consents subordinating the interests of the two banks were executed by bank officers on April 14, 2004,

[*11] approximately 100 days after the PLT agreement, and recorded in the Platte County Recorder's Office on April 15, 2004.  Each consent states that the subordination was made effective as of December 31, 2003, even though National Golf executed the PLT agreement on December 29, 2003, and recorded it on December 30, 2003.

Hillcrest Bank's consent to subordinate recites the following:  "Hillcrest hereby consents to the Conservation Easement, [sic] and subordinates its rights in the Property to the right of the Land Trust to enforce the conservation purposes set forth in the Conservation Easement in perpetuity."  Hillcrest Bank's consent to subordinate did not recite the exchange of any consideration nor did it identify the debt it intended to subordinate or any of its recorded deeds of trust.

Great Southern Bank's consent to subordinate also did not recite the exchange of any consideration but it specifically identified the following loans: (1) RP Golf in the principal amount of $4,200,000 secured by a deed of trust dated May 27, 1998; (2) National Golf in the amount of $8 million secured by a deed of trust dated October 27, 1998; (3) RP Golf in the principal amount of $3,800,000 secured by a deed of trust dated January 25, 2000; and (4) National Golf in the principal amount of $10 million secured by a deed of trust dated September 25, 2002.

**[\*12]** V.     The Appraisal

A complete appraisal in a summary report was dated April 13, 2004.  The

appraisal was addressed to the chief executive office of National Golf in regard to

a conservation easement on the National I and the National II[10] with an effective

date of December 15, 2003.  The appraisal commitment letter stated that the sole

intended users of the appraisal were the principals of National Golf and the

Internal Revenue Service in regard to a permanent conservation easement.

The property description was for 277.86 acres, and the appraisal reflected

ownership by National Golf and the "National II, LLC".[11]  The appraisal of the

National I and the National II reflected a before valuation of $17,400,000, an after

valuation of $1 million, and an easement valuation of $16,400,000.

The appraisal included several assumptions and limitations.  One was that

the title to the property interest appraised as good and marketable.  Another was

that the property was free and clear of any liens or encumbrances unless stated

otherwise.  Although a copy of the PLT agreement, reflecting National Golf as the

grantor, was included in the appraisal there was no discussion or documentation

---

[10]See supra notes 4 and 7.

[11]There is no evidence in the record that the "National II, LLC", ever owned any of the 277.86 acres reflected in the appraisal, nor did National Golf own any of section 26 reflected in the appraisal.

**[*13]** on the apparent deviation of the assumption of ownership.[12] Additionally, the appraisal does not reflect any disclosure of the deeds of trust liens or the consents to subordinate described supra sections II and IV.

VI.   Tax Return

On its Federal income tax return for 2003, Form 1065, U.S. Return of Partnership Income, timely filed on April 14, 2004, RP Golf claimed a charitable contribution deduction of $16,400,000 and attached to the return a Form 8283, Noncash Charitable Contributions. RP Golf reported on Form 8283 the easement's value and a basis of $23,930,612 in the donated property and also included an appraiser's declaration that described the donated property as a conservation easement on two golf courses that were identified as the National Golf Club of Kansas City and the National II. The declaration stated the easement's appraised fair market value as $16,400,000. RP Golf did not identify the transaction as a bargain sale and reported that no amount was received. PLT's vice president signed the form under "Donee Acknowledgment" attesting to PLT's status as a qualified organization under section 170(c) and its receipt of the easement on December 29, 2003.

---

[12]See supra note 11.

[*14] Even though RP Golf claimed a conservation easement contribution deduction on its 2003 tax return, it did not reduce the basis of the depreciable assets on the property included in the PLT agreement. RP Golf reduced only the basis of its real property subject to the provisions of the easement.

In 2006, 2007, and 2008 the parties executed Forms 872-P, Consent to Extend the Time to Assess Tax Attributable to Partnership Items, extending the assessment period of RP Golf's 2003 Federal tax return to December 31, 2008.

On August 22, 2008, respondent issued a FPAA to the tax matters partner of RP Golf. Respondent disallowed the entire charitable contribution deduction for the conservation easement on the ground that it failed to satisfy the requirements of section 170, or alternatively, it failed to establish that the easement's value was $16,400,000 and it failed to reduce the depreciable basis of the asset appropriately. Petitioner timely filed a petition with the Court.

VII.  Motion For Summary Judgment

Respondent filed a motion for summary judgment asking the Court to sustain respondent's determination disallowing petitioner's charitable contribution deduction for the conservation easement. At issue was whether RP Golf had satisfied the substantiation requirements of section 170 with respect to the conservation easement contribution. Respondent also claimed that the

[*15] conservation easement did not: (1) protect a relatively natural habitat of fish, wildlife, or plants, or a similar ecosystem under section 170(h)(4)(A)(ii) or (2) preserve open space pursuant to a clearly delineated Federal, State, or local governmental conservation policy under section 170(h)(4)(A)(iii)(II).

The PLT agreement relied upon the Missouri statutory conservation policy, limited to open spaces and areas within counties having a population of more than 200,000 residents or in any county adjoining, or city not within but adjoining such county. Mo. Ann. Stat. sec. 67.870. There was no evidence on the date of the grant that Platte County had a population that exceeded 200,000 residents, nor was there evidence that the county adjacent to Platte County had a population that exceeded 200,000 residents. In its response in opposition to respondent's motion for summary judgment, petitioner conceded that the easement was not made pursuant to a clearly delineated governmental conservation policy within the meaning of section 170(h)(4)(A)(iii)(II). Therefore, the easement's conservation purpose, as defined in section 170(h)(4), must hinge on a purpose other than a clearly delineated government conservation policy.

In RP Golf, LLC v. Commissioner, T.C. Memo. 2012-282, the Court held that the charitable contribution did not have a charitable purpose within the meaning of section 170(h)(4)(A)(iii)(II) requiring a clearly delineated Federal,

**[*16]** State, or local governmental conservation policy and that genuine issues of material fact remained concerning whether the requirements for a charitable contribution deduction under section 170 had been met for 2003.  The parties proceeded to trial on the remaining issues.

OPINION

I.    Burden of Proof

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving it incorrect.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to any deductions claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  Under section 7491(a), the burden of proof may shift to the Commissioner if the taxpayer produces credible evidence with respect to any relevant factual issue and meets other requirements.  Petitioner has not argued that section 7491(a) applies and has not shown that it meets the requirements to shift the burden of proof; therefore, the burden of proof remains on petitioner.

[*17] II.    National Golf's Property Ownership

National Golf as grantor executed a conservation easement agreement that encumbered approximately 277 acres purportedly in perpetuity to PLT, a not-for-profit corporation qualified to receive contributions under section 501(c)(3). Whether the contribution to PLT constituted a transfer for the purposes of section 170 is ultimately a question of Federal law. See United States v. Craft, 535 U.S. 274, 278 (2002). The answer to this Federal question, however, depends in part upon State law, which creates and governs the nature of interests in property. See id.; United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985); see also United States v. Mitchell, 403 U.S. 190, 197 (1971); Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967).

"A common idiom describes property as a 'bundle of sticks'--a collection of individual rights which, in certain combinations, constitute property." Craft, 535 U.S. at 278-279. "Likewise, ownership of property is not a single indivisible concept but rather an aggregate or bundle of rights pertaining to the property involved." Molbreak v. Commissioner, 61 T.C. 382, 389 (1973), aff'd, 509 F.2d 616 (7th Cir. 1975). Once property rights are determined under State law, as announced by the highest court of the State, the Federal tax consequences are decided under Federal law. Nat'l Bank of Commerce, 472 U.S. at 722; Mitchell,

**[*18]** 403 U.S. at 197; <u>Aquilino v. United States</u>, 363 U.S. 509, 512-513 (1960); <u>Morgan v. Commissioner</u>, 309 U.S. 78, 80 (1940).

In the PLT agreement National Golf purported to convey an interest in section 26 of the former Windbrook Properties, which was property that had never been conveyed to National Golf. Missouri common law corresponds with Missouri's statute of frauds and requires a written contract on any transfer of real property. See <u>McDaniel v. Park Place Care Ctr., Inc.</u>, 918 S.W.2d 820, 826 (Mo. Ct. App. 1996) ("A transfer of an interest in real property must be memorialized in writing."); <u>see also</u> <u>Gegg v. Kiefer</u>, 655 S.W.2d 834, 837 (Mo. Ct. App. 1983) (citing <u>Jones v. Linder</u>, 247 S.W.2d 817 (Mo. 1952) ("An oral contract to convey land falls within the literal ambit of the Statute of Frauds and so will not be enforced at law.").

Missouri law also requires that deeds transferring property be written and subscribed, i.e., signed by the grantor, which in this case is RP Golf. Mo. Ann. Stat. sec. 442.130 (West 2000); <u>Gregg v. Georgacopoulos</u>, 990 S.W.2d 120, 124 (Mo. Ct. App. 1999). Additionally, the validity of the easement must be judged at the time of the grant. See <u>Wachter v. Commissioner</u>, 142 T.C. 140, 148 (2014) ("[A] conservation easement fails to be 'in perpetuity' * * * if, <u>on the date of the donation</u>, the possibility that the charity may be divested of its interest in the

[*19] easement is not so remote as to be neglible." (alteration in original) (emphasis added) (quoting Graev v. Commissioner, 140 T.C. 377, 393 (2013))); Graev v. Commissioner, 140 T.C. at 393 ("[W]hether a charitable contribution was effectively 'made', whether it consisted of an 'entire interest', and whether it was a 'qualified conservation contribution'--essentially turns on the same question: At the time of * * * contributions, was the possibility that * * * the easement would be defeated 'so remote as to be negligible'?" (emphasis added)); see also Carpenter v. Commissioner, T.C. Memo. 2012-1, slip op. at 11 ("To determine whether the conservation easement deeds comply with requirements for the conservation easement deduction under Federal tax law, we must look to State law to determine the effect of the deeds. * * * Specifically, we must look to State law to determine how conservation easements may be extinguished.").

RP Golf claimed a deduction for the value of 277.86 acres. RP Golf may have intended for the entire property described in the PLT agreement executed by National Golf to be a valid charitable contribution, but neither RP Golf nor any other entity ever conveyed ownership of section 26 to National Golf. National Golf thus had no legal title to convey tracts of land in section 26 by easement or otherwise. Indeed, PLT as the donee never acquired a legal interest in an easement on any of the golf tracts in section 26 pursuant to the PLT agreement

[*20] granted by National Golf.  Thus, the grantee, PLT, had no power or authority to enforce the conservation purposes of the easement granted by National Golf for golf tracts in section 26.[13]

Therefore, the property described in the PLT agreement and located in section 26 was not a charitable contribution to PLT.  The acres in section 26 are not a valid qualified conservation contribution, and the value of those acres shall be removed from any potential charitable donation value.[14]  Whether the balance of the legal description conveyed by the PLT agreement is a qualified conservation contribution under section 170(h) is considered below.

---

[13]The property described on the survey as the National II golf tracts G and H appears to include section 26 in the easement.  See supra notes 4 and 7.

[14]See supra note 11.  Petitioner has argued that, where the grantor did not yet own the land described in a deed, he may rely on chapter 5 of the Missouri title examination standards (MTES) to cure the defect, but not so in this case.  The title exam standard described cannot be relied upon to make a current donation of an easement in property the donor does not yet own.  1 Mo. Prac., Methods of Prac.: Transact. Guide sec. 5.14 (4th ed. 2016).  First, the cure period provided in chapter 5 of the MTES is 10 years from recording.  A cure after donation is inconsistent with the requirements in section 170 that both the easement grant and the conservation purpose protection be perpetual from the time the easement is granted, not at a time 10 years after the grant.

Second, reliance on chapter 5 of the MTES requires that the Court inquire into actual events after the grant of the easement.  Even if chapter 5 of the MTES can be relied upon to cure a defect in title under State law, chapter 5 of the MTES cure period cannot be used to cure a defective charitable contribution for purposes of Federal income tax law.

**[*21]** III.    <u>Noncash Charitable Contributions and the Balance of the Easement</u>

A taxpayer is generally allowed a deduction for any charitable contribution made during the taxable year.  Sec. 170(a)(1).  A charitable contribution includes a gift of property to a charitable organization, made with charitable intent and without receiving or expecting to receive adequate consideration.  <u>See</u> <u>Hernandez v. Commissioner</u>, 490 U.S. 680, 690 (1989); <u>United States v. Am. Bar Endowment</u>, 477 U.S. 105, 116-118 (1986); <u>see also</u> sec. 1.170A-1(h)(1) and (2), Income Tax Regs.  The term "charitable contribution" as used in section 170 has been generally held synonymous with the term "gift."  <u>Considine v. Commissioner</u>, 74 T.C. 955, 967 (1980); <u>Sutton v. Commissioner</u>, 57 T.C. 239, 242 (1971);  <u>DeJong v. Commissioner</u>, 36 T.C. 896, 899 (1961), <u>aff'd</u>, 309 F.2d 373 (9th Cir. 1962).  "A gift is generally defined as a voluntary transfer of property <u>by the owner</u> to another without consideration therefor."  <u>Considine v. Commissioner</u>, 74 T.C. at 967 (emphasis added) (quoting <u>DeJong v. Commissioner</u>, 36 T.C. at 899).  While a taxpayer is generally not allowed a charitable contribution deduction for a gift of property consisting of less than an entire interest in that property, an exception is made for a "qualified conservation contribution."  <u>See</u> sec. 170(f)(3)(A), (B)(iii).

[*22] Under section 170(h)(1), a "qualified conservation contribution" is a contribution (1) of a "qualified real property interest," (2) to a "qualified organization," (3) which is made "exclusively for conservation purposes." See also sec. 1.170A-14(a), Income Tax Regs. The Court will focus on the third requirement; i.e., whether National Golf's contribution of the donated property was exclusively for conservation purposes. A contribution is made exclusively for conservation purposes only if it meets the requirements of section 170(h)(4) and (5). Glass v. Commissioner, 124 T.C. 258, 277 (2005), aff'd, 471 F.3d 698 (6th Cir. 2006). The Court will begin the analysis with the requirements of section 170(h)(5).

Section 170(h)(5)(A) provides that "[a] contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity." The parties disagree on whether the conservation purpose of the donated property is protected in perpetuity. Respondent argues that the donated property is not protected in perpetuity by virtue of Great Southern Bank's and Hillcrest Bank's recorded deeds of trust on the subject property. Petitioner argues that the conservation purpose of the donated property is protected in perpetuity because Great Southern Bank and Hillcrest Bank had orally agreed to the conveyance at the time of the easement. The banks then subordinated their

[*23] interests in the subject property to PLT's right to enforce the terms of the easement in documents executed and recorded after the grant of the easement and recordation of the PLT agreement.

The perpetuity requirement of section 170(h)(5)(A) has its origins in the Tax Reduction and Simplification Act of 1977 (TRSA 1977), Pub. L. No. 95-30, sec. 309(a), 91 Stat. at 154.[15]  In TRSA 1977 sec. 309, Congress temporarily allowed a charitable contribution deduction for an "easement with respect to real property granted in perpetuity to * * * [a governmental unit or qualifying charitable organization] exclusively for conservation purposes".  The House conference report on TRSA 1977 explained:

> While it is intended that the term "conservation purposes" be liberally construed with regard to the types of property with respect to which deductible conservation easements * * * may be granted, it is also intended that contributions of perpetual easements * * * qualify for the deduction only in situations where the conservation purposes of protecting or preserving the property will in practice be carried out. Thus, it is intended that a contribution of a conservation easement

---

[15]The Tax Reform Act of 1976, Pub. L. No. 94-455, sec. 2124(e), 90 Stat. at 1919, authorized a deduction for the donation of an "easement with respect to real property * * * exclusively for conservation purposes". See Glass v. Commissioner, 124 T.C. 258, 277-280 (2005) (examining the legislative history of the requirement that a qualified contribution of a conservation easement be exclusively for conservation purposes), aff'd, 471 F.3d 698 (6th Cir. 2006). Congress amended sec. 170(f)(3) to require that the easement be granted in perpetuity in the Tax Reduction and Simplification Act of 1977 (TRSA 1977), Pub. L. No. 95-30, sec. 309(a), 91 Stat. at 154.

**[*24]** * * * qualify for a deduction only if the holding of the easement * * * is related to the purpose or function constituting the donee's purpose for exemption (organizations such as nature conservancies, environmental, and historic trusts, State and local governments, etc.) and the donee is able to enforce its rights as holder of the easement * * * and protect the conservation purposes which the contribution is intended to advance. The requirement that the contribution be exclusively for conservation purposes is also intended to limit deductible contributions to those transfers which require that the donee hold the easement * * * exclusively for conservation purposes (i.e., that they not be transferable by the donee in exchange for money, other property, or services). [H.R. Conf. Rept. No. 95-263, at 30-31 (1977), 1977-1 C.B. 519, 523.]

Congress again drew attention to the protection of a contributed conservation easement in the Act of Dec. 17, 1980 (1980 Act), Pub. L. No. 96-541, sec. 6(b), 94 Stat. at 3206, which extended permanently the deduction for a charitable contribution of a qualified conservation easement.[16] The Senate report accompanying the enactment stated:

> The bill retains the present law requirement that contributions be made "exclusively for conservation purposes." Moreover, the bill explicitly provides that this requirement is not satisfied unless the conservation purpose is protected in perpetuity. The contribution must involve legally enforceable restrictions on the interest in the property retained by the donor that would prevent uses of the retained interest inconsistent with the conservation purposes. * * *

> \*       \*       \*       \*       \*       \*       \*

---

[16]In the Act of Dec. 17, 1980, sec. 6(c), 94 Stat. at 3207, Congress effectively made permanent the deduction for such a partial interest contribution of a qualified conservation easement.

**[\*25]**      By requiring that the conservation purpose be protected in perpetuity, the committee intends that the perpetual restrictions must be enforceable by the donee organization (and successors in interest) against all other parties in interest (including successors in interest). * * *

[S. Rept. No. 96-1007, at 13-14 (1980), 1980-2 C.B. 599, 605.]

The Secretary published final regulations interpreting section 170(h)(5) on January 14, 1986. See T.D. 8069, 1986-1 C.B. 89. These regulations in relevant part interpret section 170(h)(5)(A) as follows:

§1.170A-14. Qualified conservation contributions.--

(g) Enforceable in perpetuity.--(1) In general.--In the case of any donation under this section, any interest in the property retained by the donor (and the donor's successors in interest) must be subject to legally enforceable restrictions (for example, by recordation in the land records of the jurisdiction in which the property is located) that will prevent uses of the retained interest inconsistent with the conservation purposes of the donation. * * *

(2) Protection of a conservation purpose in case of donation of property subject to a mortgage.--In the case of conservation contributions made after February 13, 1986, no deduction will be permitted under this section for an interest in property which is subject to a mortgage unless the mortgagee subordinates its rights in the property to the right of the qualified organization to enforce the conservation purposes of the gift in perpetuity. * * *

With the origins of section 170(h)(5)(A) and its relevant legislative history and regulatory interpretation in mind, the Court now returns to the question of whether the donated property was protected in perpetuity.

[*26] On December 29, 2003, when National Golf executed the PLT agreement purporting to grant the conservation easement to PLT, the property was subject to senior deeds of trust held by Great Southern Bank and Hillcrest Bank, and neither bank joined or acknowledged the PLT agreement. Consents to subordinate the interests of the two banks were not executed by bank officers until April 14, 2004, over 100 days after the PLT agreement and on the same date as RP Golf's 2003 tax return reported the contribution. The consents to subordinate were recorded in the Platte County Recorder's Office on April 15, 2004. Although the PLT agreement was executed by National Golf on December 29, 2003, and recorded on December 30, 2003, each consent states that the subordination was made effective as of December 31, 2003.

The Hillcrest loan of $12,500,000 was made to RP Golf in January 2001. The 2001 deed of trust, granted by RP Golf, National Golf, and the related entity, included the property described in the PLT agreement as security for the 2001 Hillcrest loan. Section 15.1 of the 2001 deed of trust contains standard provisions that any transfer of any interest in the property was prohibited without the consent of Hillcrest Bank and that a violation of the transfer prohibition would result in an event of default. The 2001 deed of trust also requires any amendment to be in writing.

[*27] Through a series of modifications, the Hillcrest loan was modified to extend the maturity date to February 7, 2004, and the 2001 deed of trust was amended by a modification agreement dated April 8, 2003, and recorded on February 11, 2004. Additionally, the 2004 Hillcrest modification increased the Hillcrest loan principal to $10,900,000 and extended the maturity date to February 7, 2005, and the 2001 deed of trust modification was dated February 7, 2004, and recorded on March 16, 2004. RP Golf and the grantor of the easement, National Golf, executed the modification to extend the maturity date from February 7, 2004, to February 7, 2005; none of the modifications disclosed the conveyance of the easement to PLT. On December 29, 2003, when National Golf conveyed the easement to PLT, the Hillcrest loan and deed of trust had been previously recorded and the maturity date of the debt was February 7, 2004.

On April 14, 2004, Hillcrest Bank executed a consent to subordinate that recited the following: "Hillcrest hereby consents to the Conservation Easement, and subordinates its rights in the Property to the right of the Land Trust to enforce the conservation purpose set forth in the Conservation Easement in perpetuity." The document did not include descriptions of any loan debt or deed of trust information that it might be subordinating.

**[\*28]** Great Southern Bank made four loans to National Golf and/or RP Golf. Great Southern Bank's consent to subordinate specifically recited the following loans: (1) RP Golf in the principal amount of $4,200,000 secured by a deed of trust dated May 27, 1998; (2) National Golf in the amount of $8 million secured by a deed of trust dated October 27, 1998; (3) RP Golf in the principal amount of $3,800,000 secured by a deed of trust dated January 25, 2000; and (4) National Golf in the principal amount of $10 million secured by a deed of trust dated September 25, 2002. All of these deeds of trust predated the PLT agreement.

Under Missouri law, a deed of trust is a form of mortgage consisting of an instrument that uses an interest in real property as security for performance of an obligation. Bob DeGeorge Associates, Inc. v. Hawthorn Bank, 377 S.W.3d 592, 597 (Mo. 2012). A deed of trust is subject to the recording statutes and may be foreclosed. Id. Such foreclosure conveys title as it existed "on the date the foreclosed deed of trust was recorded." Golden Delta Enters., L.L.C. v. US Bank, 213 S.W.3d 171, 175 (Mo. Ct. App. 2007). Foreclosure extinguishes any junior encumbrance, including an easement. See Monterey Dev. Corp. v. Lawyer's Title Ins. Corp., 4 F.3d 605, 609 (8th Cir. 1993) (referencing a junior mortgage); S.S. Kresge Co. v. Shankman, 212 S.W.2d 794, 801-802 (Mo. Ct. App. 1948) (referencing a junior easement).

[*29] In Missouri every written instrument that conveys or affects real estate must be recorded in the office of the recorder of the county in which such real estate is situated. Mo. Ann. Stat. sec. 442.380. Further, no such written instrument is valid, except between the parties thereto and those who have actual notice thereof, until the instrument is deposited with the recorder for record. Id. Generally, the first recorded instrument has seniority and priority over later recorded property instruments. Golden Delta Enters., 213 S.W.3d at 175.

The final regulations interpreting section 170(h)(5) in regard to the protection of a conservation purpose of a donated property subject to a mortgage was not the topic of a Court decision before the December 2003 PLT agreement. The issue was first considered in Mitchell v. Commissioner (Mitchell I), 138 T.C. 324 (2012), supplemented by T.C. Memo. 2013-204 (Mitchell II), aff'd, 775 F.3d 1243 (10th Cir. 2015), where a 2003 conveyance failed as a qualified conservation easement when a subordination agreement was not signed until almost two years after the grant of the conservation easement. The Court held that "[t]hough the subordination regulation is silent as to when a taxpayer must subordinate a preexisting mortgage on donated property, we find that the regulation requires that a subordination agreement must be in place at the time of the gift." Mitchell I, 138 T.C. at 332; see also Minnick v. Commissioner, T.C. Memo. 2012-345, at *7,

[*30] aff'd, 796 F.3d 1156 (9th Cir. 2015).  The Court also held that the mortgage was not subordianted to the conservation easement when it was granted in 2006 and no deduction was permitted.

In Mitchell II, the Court denied the taxpayer's motion to reconsider its Opinion in Mitchell I.  In Mitchell II the Court, relying on Carpenter v. Commissioner, T.C. Memo. 2013-172, at *21, stated that the specific provisions of section 1.170A-14(g), Income Tax Regs., are mandatory and may not be ignored.  Mitchell II, at *22.  The Court upheld the requirement that the subordination agreement be in place at the time of the gift.  Id.

Like the facts in Mitchell I, the facts in this case focus on the requirements of section 170(h) and the underlying regulations, including the requirement that the deed of trust be subordinate to the conservation easement agreement.  See sec. 1.170A-14(g)(2), Income Tax Regs.  The consents to subordinate from Hillcrest Bank and Great Southern Bank were not recorded on the date National Golf granted the easement.  In order for RP Golf to be eligible for a charitable contribution deduction for 2003, it had to meet all the requirements of section 170(h).

Petitioner argues that the facts of this case are distinguishable from the facts in Mitchell I.  Specifically, petitioner argues that in Mitchell I the taxpayer

[*31] obtained the required subordinations two years after the grant of easement and that the taxpayer had no prior oral consent from the lender. However, the Court's Opinion in Mitchell I considered the taxpayer's position that an oral agreement with the lender not to develop the property was in place that would satisfy the perpetuity requirement of section 170(h)(5). See Mitchell I, 138 T.C. at 331, 338. Petitioner is now making the argument that the prior oral agreement to subordinate the deed of trust satisfied the pertinent perpetuity requirements. The Court in Mitchell I held that the oral agreement not to develop the property had no effect on the mortgagee's ability to foreclose on the property and extinguish the conservation easement had the taxpayer defaulted on her promissory note. Id. at 338. The Court ultimately concluded that an oral agreement failed to meet the perpetuity requirements of section 1.170A-14(g)(2), Income Tax Regs. See also Minnick v. Commissioner, at *7-*8 (Finding that when subordinating a mortgage, intention and willingness are not what matters at the time of granting a conservation easement.).

In addition, RP Golf argues that it entered into enforceable oral agreements with Great Southern Bank and Hillcrest Bank to subordinate the lenders' interests and that these agreements were confirmed in writing after the PLT agreement was recorded. RP Golf claims that the oral agreements to subordinate were

[*32] enforceable against the lenders under Missouri law and thereby satisfied the requirements of section 1.170A-14(g)(2), Income Tax Regs. Petitioner cites Loewen v. Forsee, 38 S.W. 712 (Mo. 1897) (holding oral agreement regarding priority of liens was not subject to statute of frauds), and Comty. Title Co. v. Crow, 728 S.W.2d 652 (Mo. Ct. App. 1987) (holding mortgagee was estopped from asserting priority of his deed of trust), as precedent to support RP Golf's claim that its alleged oral agreements with Great Southern Bank and Hillcrest Bank were enforceable. However, Loewen does not apply to a contract concerning an interest in land, which is addressed in and subject to the Missouri statute of frauds. In addition, in Comty. Title Co. the mortgagee had actually executed the contract of sale agreeing to subordinate his purchase money mortgage to the construction lender, even though the mortgagee claimed he just signed for his corporation. Comty. Title Co., 728 S.W.2d at 654. The Court rejected the mortgagee's argument and estopped his priority assertion. Id. at 655.

The parties disagree over the enforceability of oral agreements regarding real estate under Missouri law and its statute of frauds. The Missouri statute of frauds provides, in pertinent part:

> No action shall be brought * * * upon any contract made for the sale of lands, tenements, hereditaments, or an interest in or concerning them * * * unless the agreement upon which the action

**[*33]** shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized * * *  [Mo. Ann. Stat. sec. 432.010 (West 2010).]

Missouri common law corresponds with Missouri's statute of frauds and requires a written contract on any transfer of real property.  See Gegg v. Kiefer, 655 S.W.2d at 837 (citing Jones, 247 S.W.2d 817 ("An oral contract to convey land falls within the literal ambit of the Statute of Frauds and so will not be enforced at law."); see also McDaniel, 918 S.W.2d at 826 ("A transfer of an interest in real property must be memorialized in writing.").  Further, no such written instrument is valid, except between the parties thereto and those who have actual notice thereof, until the instrument is deposited with the recorder for record.  Mo. Ann. Stat. sec. 442.400.

Generally, the first recorded instrument has seniority and priority over later recorded property instruments.  Golden Delta Enters., 213 S.W.3d at 175.  However, a bona fide purchaser takes free of adverse claims to title of unrecorded interests.  City of Branson v. Branson Hills Master Ass'n, Inc., 292 S.W.3d 467, 473 (Mo. Ct. App. 2009) (citing In re Idella M. Fee Revocable Trust, 142 S.W.3d 837, 842 (Mo. Ct. App. 2004)); Golden Delta Enters., 213 S.W.3d at 175.  A bona fide purchaser is someone who pays valuable consideration, has no notice of

**[\*34]** encumbrances, and acts in good faith. <u>McAboy v. Parker</u>, 353 Mo. 1219, 1224 (1945). A person who obtains title by gift cannot be a bona fide purchaser because he does not give valuable consideration. <u>See</u> <u>Greer v. Orchard</u>, 161 S.W. 875, 876 (Mo. Ct. App. 1913).

But the evidence does not establish the oral consent agreements that RP Golf claims to have reached with Great Southern Bank and Hillcrest Bank regarding subordination of their interests in the easement property. The record contains no testimony or documentation from either of the banks that is dated on or before the date National Golf executed the PLT agreement to convey the easement to PLT and that corroborates RP Golf's claim of an oral agreement to subordinate.[17] Neither of the consents to subordinate signed by Great Southern Bank and Hillcrest Bank recites the exchange of any consideration for the respective consents to subordinate. Even though RP Golf's representative testified that he was "sure" he talked with Great Southern Bank and Hillcrest Bank about subordinating their interests to the easement before December 29, 2003, he did not remember who he talked to at the banks. In addition, the Hillcrest loan and

---

[17]During the audit and before the notice of deficiency was issued, Hillcrest Bank provided a letter stating that Hillcrest Bank had a security interest in the golf courses although the golf courses were not the primary collateral. An oral agreement to subordinate was not addressed in the correspondence.

**[*35]** modification agreements specifically included an oral agreement statutory notice prohibition as follows:

> Statutory Notice. Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt, including promises to extend or renew such debt, are not enforceable. To protect you (borrower(s)) and us (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it. * * *

The Great Southern Bank promissory notes contained a substantially similar prohibition on oral agreements. RP Golf's representative signed each of the modification agreements and promissory notes. Neither of the consents to subordinate signed by Great Southern Bank and Hillcrest Bank was signed before April 14, 2004, or recorded before April 15, 2004. The evidence establishes that both Great Southern Bank and Hillcrest Bank eventually consented to, and did, subordinate their respective interests in the easement property. However, the evidence fails to establish that RP Golf and Great Southern Bank and Hillcrest Bank entered into any agreements, oral or written, binding under Missouri law, regarding subordination to the easement on or before December 29, 2003, the date of the PLT agreement.[18]

---

[18]Both banks' financing documents prohibited any transfer of interest in the

(continued...)

[*36] The property described in the PLT agreement purporting to grant a conservation easement was subject to preexisting, unsubordinated mortgages on the date of the grant. Because the easement granted by National Golf could have been extinguished by foreclosure between December 29, 2003, and April 15, 2004, it was not protected in perpetuity and, therefore, was not a qualified conservation contribution. The potential for foreclosure of the easement was not illusory; at the time of the grant Hillcrest Bank held a senior deed of trust of $9,900,000 that matured and was due and payable on February 7, 2004. The senior deed of trust had priority over any enforceable right of PLT under the PLT agreement. In addition, when the party principals executed documents to increase the principal amount of the indebtedness to $10,900,000 and extend the maturity date from February 7, 2004, to February 7, 2005, those documents failed to disclose PLT's interest in the underlying property. National Golf had pledged, in the grant of the easement, to disclose the easement by reference in any legal instrument that divests itself of any interest in all or a portion of the land. The parties did not secure a consent to subordinate from Hillcrest before the loan and deed of trust maturity date of February 7, 2004. RP Golf, through its single

---

[18](...continued)
property without consent of the bank, and failure to obtain consent would result in a default.

[*37] member LLC, had potentially reduced the value of 277 acres of the underlying security interest held by the banks from $17,400,000 to $1 million (see appraisal discussion supra p. 12) and had failed to disclose or protect PLT, which held the purported conservation easement, before increasing the liability.  As a result, the easement could have been extinguished by foreclosure and, therefore, petitioner did not satisfy the requirements of section 170(h)(5) and section 1.170A-14(g)(2), Income Tax Regs.

Because it has not been established that all of the requirements of section 170 have been satisfied for the noncash charitable contribution of a qualified conservation contribution, the balance of those requirements, the conservation purposes, and the purported value of the charitable contribution will not be discussed.  Accordingly, the charitable contribution deduction is decreased by $16,400,000 for the tax year ended December 31, 2003.

The Court has considered all arguments the parties have made, and to the extent not discussed herein, finds that they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered
for respondent.